UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | No. | 08 CR 888 |
| v. | ) | Judge James B. Zagel | |
| | ) | | |
| ROD BLAGOJEVICH and | ) | | |
| ROBERT BLAGOJEVICH | ) | | |

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits this written proffer,

pursuant to the provisions of Federal Rule of Evidence ("Rule") 801, including Rule 801(d)(2)(E),

and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the government's evidence

supporting the admission of certain co-conspirator statements at trial.

This proffer begins by discussing case law governing the admissibility of co-conspirator

statements under Rule 801(d)(2)(E), and, alternatively, other provisions of Rule 801(d)(2). Next,

this proffer summarizes some of the evidence supporting the admission of co-conspirator statements.

In this manner, the government will establish to the Court the existence of the evidence available

to complete the necessary foundation at trial, the roles of certain witnesses, and the bases for

admission. The government is not detailing all of its evidence that would go to show the existence

of the pertinent conspiracies, or all of the co-conspirator statements that were made in furtherance

of the conspiracies charged in the indictment. Rather, this proffer highlights for the Court samples

of the government's evidence in order to establish to the Court the existence of the conspiracies

described in Counts Two, Seventeen, Eighteen, Twenty-One, and Twenty-Three, and the scheme

described in Counts Three through Thirteen, and the roles of the various conspirators.[1]  Thus, this proffer does not list all of the government's witnesses and the evidence each will present, nor does it provide all of the evidence that will be presented by those witnesses who are named.  Finally, by presenting statements attributed to particular witnesses, the government is not herein committing to call each of the witnesses for each of the statements attributed.

## I.    OVERVIEW OF THE CHARGED OFFENSES

Defendant Rod Blagojevich has been charged with conspiracy to commit racketeering acts, racketeering, mail and wire fraud, attempted extortion, conspiracy to commit extortion, bribery, and conspiracy to commit bribery, while defendant Robert Blagojevich has been charged with wire fraud, conspiracy to commit extortion, attempted extortion, and conspiracy to commit bribery.  The Second Superseding indictment charges that the defendants, together with others, used and agreed to use the powers of the Office of the Governor of the State of Illinois, and of certain state boards and commissions subject to influence by the Office of the Governor, to take and cause governmental actions, including: appointments to boards and commissions; the awarding of state business, grants, and investment fund allocations; the enactment of legislation and executive orders; and the appointment of a United States Senator; in order to obtain financial benefits for themselves and others, including campaign contributions for Rod Blagojevich, and employment for Rod Blagojevich and his wife.

---

[1] There are multiple conspiracies and schemes alleged in the Second Superseding Indictment.  The evidence in support of those conspiracies and schemes overlaps significantly, so that, for example, the evidence that supports the existence of the racketeering conspiracy charged in Count Two also supports the existence of the honest services fraud scheme charged in Counts Three through Thirteen.  Due to the overlap of this evidence, the government will not make a separate showing for each conspiracy or scheme charged in the Second Superseding Indictment.

## II.    THE LAW GOVERNING THE ADMISSIBILITY OF CO-SCHEMERS' STATEMENTS

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The admission of a co-conspirator statement against a defendant is proper where the government establishes by a preponderance of evidence that: (1) a conspiracy or scheme existed; (2) the defendant and the declarant were members of that particular conspiracy or scheme; and (3) the statement was made during the course and in furtherance of the conspiracy or scheme. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002).

### A.    The *Santiago* Proffer is the Approved Method of Proffering Co-Schemer Statements

In this Circuit, the preferred way for the government to makes its preliminary factual showing as to the admissibility of such statements is by filing a pretrial written proffer of the government's evidence. *See, e.g., United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v. Irorere,* 228 F.3d 816, 824 (7th Cir. 2000).[2] In making its preliminary factual determinations, the Court must consider the statements themselves as evidence of a conspiracy and whether the statements the government seeks to admit were made in furtherance of that conspiracy. *See United States v. Brookins*, 52 F.3d 615, 623 (7th Cir. 1995); *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Indeed, the Court may consider all non-privileged evidence. *See United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996).

---

[2]*Accord, e.g.,United States v. Haynie,* 179 F.3d 1048, 1050 (7th Cir.1999); *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992).

B.    **Co-conspirator Statements Are Admissible as Nonhearsay Despite the Absence of a Formal Conspiracy Charge**

As noted above, statements may be admitted under Rule 801(d)(2)(E) notwithstanding the lack of any formal conspiracy charge. *See, e.g., United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997); *Santiago*, 582 F.2d at 1130.[3/]  In addition, there is no requirement that each member of the venture share a criminal intent for the co-conspirator rule to apply to statements that members made in furtherance of the conspiracy.  These two rules are based on the very nature of the co-conspirator doctrine:

> The distinction should be noted between "conspiracy" as a crime and the co-conspirator exception to the hearsay rule.  Conspiracy as a crime comprehends more than mere joint enterprise.  It also includes other elements, such as a meeting of the minds, criminal intent and, where required by statute, an overt act.  . . .  The co-conspirator exception to the hearsay rule, on the other hand, is merely a rule of evidence founded, to some extent, on concepts of agency law.  It may be applied in both civil and criminal cases. . . . Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.

> *        *        *

> The substantive criminal law of conspiracy, though it obviously overlaps in many areas, simply has no application to this evidentiary principle. Thus, <u>once the existence of a joint venture for an illegal purpose, or for a legal purpose using illegal means, and a statement made in the course of and in furtherance of that venture have been demonstrated by a preponderance of the evidence, it makes no difference whether the declarant or any other "partner in crime" could actually be tried, convicted and punished for the crime of conspiracy</u>.

*United States v. Gil*, 604 F.2d 546, 549-550 (7th Cir. 1979) (citations omitted and emphasis added).

---

[3/]*See also, e.g., United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) (conspiracy charge not a condition for admitting statements under Rule 801(d)(2)(E)); *accord, United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990); *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989); *United States v. LeFevour*, 798 F.2d 977, 983 (7th Cir. 1986).

This distinction was explored in *United States v. Coe*, 718 F.2d 830 (7th Cir. 1983). In *Coe*, the court explained that a so-called co-conspirator statement's admissibility does not depend on the substantive law of conspiracy:

> Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. . . . Recognizing this, some courts refer to the coconspirator exception as the "joint venture" or "concert of action" exception. . . . A charge of criminal conspiracy is not a prerequisite for the invocation of this evidentiary rule. . . . Indeed, it may be invoked in civil as well as criminal cases. . . .
>
> The proposition that the government did have to establish by a preponderance of independent evidence was that [the individuals] . . . were engaged in a joint venture-- that there was a "combination between them . . . ."

*Coe*, 718 F.2d at 835 (citations omitted).[4]

## C. The Supreme Court's *Crawford* Decision Has Not Changed the Admissibility of Co-Conspiracy Statements

The Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), changed much of the law concerning out-of-court testimonial statements, but it did not affect the admissibility of co-conspirator statements. In *Crawford*, the prosecution introduced a tape-recorded statement made before trial by the defendant's wife to law enforcement. *Id.* at 38. At trial, however, the wife was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not have an opportunity to cross-examine her. *Id.* at 40. The Court ruled that admission of the statement violated the Confrontation Clause, holding that where the government offers an unavailable declarant's hearsay that is "testimonial" in nature, the Confrontation Clause requires actual

---

[4]*See also Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249 (1917) (explaining origin of the co-conspirator rule in the law of partnership: "the act or declaration of one, in further-ance of the common object, is the act of all, and is admissible as primary and original evidence against them.").

confrontation, that is, cross-examination, regardless of how reliable the statement may be. *Id.* at 51-52. As examples of "testimonial" statements, the Court listed prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. *Id.* at 68.

The rule in *Crawford* does not apply, however, to statements that are not hearsay.[5] Thus, the Seventh Circuit has squarely held that *Crawford* does not apply to – and did not change the law relating to – co-conspirator statements. In *United States v. Jenkins*, 419 F.3d 614 (7th Cir.), *cert. denied*, 126 S. Ct. 782 (2005), the Seventh Circuit noted:

> As to the Confrontation Clause argument, *Crawford* does not apply. The recordings featured the statements of co-conspirators. These statements, by definition, are not hearsay. *Crawford* did not change the rules as to the admissibility of co-conspirator statements.

419 F.3d at 618; a*ccord, United States v. Tolliver*, 454 F.3d 1160, 1165 (7th Cir. 2006). Because co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and those statements may be admitted without offending the Sixth Amendment.

### D. The Proper Standard for Admissibility Is Preponderance of the Evidence

A district court's preliminary determination of admissibility for purposes of Rule 801(d)(2)(E) is distinct from the standard required in determining on appeal whether sufficient evidence exists to uphold a jury verdict. The standard to be applied in the context of admissibility

---

[5]The rule in *Crawford* also does *not* apply where: (1) a statement, though testimonial in nature, is not offered for the truth of the matter asserted, 541 U.S. at 59 n.9; (2) the declarant testifies at trial and is subject to cross-examination regarding the prior statement, *id.* at 59 n.9; (3) the statement is non-testimonial, *id.* at 60; or (4) the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination, *id.* at 59. Another exception to the confrontation requirement applies where the defendant procured the declarant's unavailability, that is, "forfeiture by wrong-doing," *see id.* at 62; Fed. R. Evid. 804(b)(6).

under Rule 801(d)(2)(E) is a preponderance-of-the-evidence standard. *Lindemann*, 85 F.3d at 1238 (*citing Bourjaily*, 438 U.S. at 175-76).

### E. Principles for Determining Membership in and Existence of the Criminal Conspiracy

#### 1. The Court May Consider the Proffered Statements Themselves

A district court may consider the proffered statements themselves in determining the existence of a conspiracy, and a defendant's participation in it. *Bourjaily,* 483 U.S. at 180; *United States v. de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990).

#### 2. Both Direct and Circumstantial Evidence Can Be Considered

A district court can also consider both direct and circumstantial evidence to determine the existence of a conspiracy. *See United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991); *United States v. Patterson*, 213 F. Supp. 2d 900, 910-11 (N.D. Ill. 2002)(Bucklo, J.), *aff'd*, 348 F.3d 218, 225-26 (7th Cir. 2003).[6] Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983); *see also Lindemann*, 85 F.3d at 1238 (secretive nature of conspiracies one reason for conspirator exception to hearsay rule).

#### 3. Requirements for Determining if a Person has Joined the Conspiracy

A defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met or

---

[6]Even though the government need not prove the crime of conspiracy for the co-conspirator doctrine to apply, criminal conspiracy cases are helpful in stating the types of evidence that are sufficient to show conspiracy. If the government meets the higher standard for criminal conspiracy, *a fortiorari*, the evidentiary standard is met.

has agreed with every co-conspirator. *See United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986); *United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); *see also Rodriguez*, 975 F.2d at 411 (defendant must have intended to join and associate himself with the conspiracy's criminal design and purpose). The government need not prove, however, that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Sims*, 808 F. Supp. 620, 623 (N.D. Ill. 1992) (Alesia, J.). As the Supreme Court has said:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . . The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. . . . If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Salinas v. United States*, 522 U.S. 52, 63-4 (1997) (citations omitted).[7] A defendant may be found to have participated in a conspiracy even if he joined or terminated his relationship with others at a different time than another defendant or co-conspirator. *See United States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.1985).[8] A district court may consider the conduct, knowledge, and statements of the defendant and others in establishing participation in a conspiracy. A single act or conversation, for example, can suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to

---

[7] *See also United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985); *United States v. Morrow*, 971 F. Supp. 1254, 1256-57 (N.D. Ill. 1997)(Alesia, J.).

[8] A defendant, even if not an "agreeing" member of a conspiracy, may nonetheless be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy, *see United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *Sims*, 808 F. Supp. at 623 n.1, even if the defendant was not charged with aiding and abetting, *see United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir.1985).

participate in an unlawful enterprise. *See, e.g., Sims*, 808 F. Supp. at 623.[9/] Statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern. *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987). A co-conspirator who has become inactive in the scheme nevertheless is liable for his co-conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987). *See also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).

## F. Statements Made in Furtherance of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable-basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the co-conspirator exception. *See, e.g., Johnson*, 200 F.3d at 533 (citing *United States v. Stephenson,* 53 F.3d 836, 845 (7th Cir. 1995)).

The Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *See, e.g.*, *United States v. Cozzo*, No. 02 CR 400, 2004 U.S. Dist. LEXIS 7391 (N.D. Ill. April 16, 2004) (Zagel, J.) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" is admissible under Rule 801(d)(2)(E). *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994) (*quoting United States*

---

[9/]Similarly, efforts by an alleged co-conspirator to conceal a conspiracy may support an inference that he joined the conspiracy while it was still in operation. *See Redwine;* 715 F.2d at 321; *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. 1981).

*v. Johnson*, 927 F.2d 999, 1001 (7th Cir. 1991)); *accord*, *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made: (1) to identify other members of the conspiracy and their roles, *United States v. Roldan-Zapata,* 916 F.2d 795, 803 (2d Cir. 1990); *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); (2) to recruit potential co-conspirators, *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999); (3) to control damage to an ongoing conspiracy, *United States v. Van Daal Wyk,* 840 F.2d 494, 499 (7th Cir. 1988); *Kapp*, 2003 U.S. Dist. LEXIS 3989, at *3; (4) to keep co-conspirators advised as to the progress of the conspiracy, *Potts*, 840 F.2d at 371; *Kapp*, 2003 U.S. Dist. LEXIS 3989, at *3; (5) to conceal the criminal objectives of the conspiracy, *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); (6) to plan or to review a co-conspirator's exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a co-conspirator can be trusted to perform his role. *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990); *Van Daal Wyck*, 840 F.2d at 499. The Seventh Circuit has also said that "[s]tatements made to keep co-conspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." *Stephenson,* 53 F.3d at 845. *Accord, United States v. Curtis*, 37 F.3d 301, 307 (7th Cir. 1994).

### 1.    Statements Made to Execute the Conspiracy

Statements made by co-conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *Cox*, 923 F.2d at 527. Statements such as these, which are "intended to promote the conspiratorial objectives," should be admitted pursuant to Rule 801(D)(2)(E).[10] Statements that prompt the

---

[10]*United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *accord, United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994).

listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy.[11/]  Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made.  *See Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

### 2.        Statements Regarding the Conspiracy's Activities

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because co-conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy.  *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).  Similarly, statements that are part of the information flow between co-conspirators made in order to help each co-conspirator perform his role are "in furtherance" of the conspiracy. *See, e.g.*, *Godinez,* 110 F.3d at 454; *Garlington*, 879 F.2d at 283-84;  *Van Daal Wyk,* 840 F.2d at 499.  Statements to assure that a co-conspirator can be trusted to perform his role also satisfy the "in furtherance" requirement.  *See, e.g.*, *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *de Ortiz*, 907 F.2d at 635-36 (7th Cir. 1990).

### 3.        Statements to Recruit Co-conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy.  *Curry*, 187 F.3d at 766; *Godinez*, 110 F.3d at 454.[12/]

---

[11/]*United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987).

[12/] *See also, e.g., United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *Garlington*, 879 F.2d at 283.

4. **Statements Regarding the Activities of Other Co-conspirators Designed to Inform or Reassure the Listener**

Statements made by co-conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499 (wholesaler instructed his courier not to deliver any additional quantities of cocaine to the defendant, a dealer).

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname. . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

*Pallais*, 921 F.2d at 688. The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. *See id.; Van Daal Wyk*, 840 F.2d at 499.

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (description of past drug deals). Likewise, statements made to reassure and calm the listener may further the conspiracy, *see Garlington*, 879 F.2d at 284 ; *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989) (upholding admission of statements designed to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy).

5. **Statements Relating to the Progress and Past Accomplishments of the Conspiracy**

Statements made by co-conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371; *Molt*, 772 F.2d at 368-69. Similarly, statements regarding

a co-conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

### 6. Statements to Conceal the Criminal Objectives of the Conspiracy

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes. *See, e.g., United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995); *Kaden*, 819 F.2d at 820; *United States v. Bouzanis,* No. 00 CR 1065, 2003 U.S. Dist. LEXIS 16218, at *21 n.5 (N.D. Ill. Sept. 15, 2003) (Lefkow, J.). "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Stephenson*, 53 F.3d at 845; *Van Daal Wyk*, 840 F.2d at 499.

### G. Alternative Bases for Admissibility of Statements

The government believes that the statements of co-conspirators set forth in this proffer should be admitted as non-hearsay under the co-conspirator doctrine. There are alternative bases, however, for admission of many of the statements. These bases do not require a Rule 801(d)(2)(E) analysis.

### 1. Defendant's Own Statements

A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the co-conspirator statement rule.[13] *Maholias*, 985 F.2d at 877. A defendant's

---

[13] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

own admissions, moreover, are relevant to establishing the factual predicates for the admission of co-conspirator statements against him. *See, e.g., Godinez*, 110 F.3d at 455; *Potts*, 840 F.2d at 371-72.[14]

### 2. Statements by a Person Authorized by Defendant to Make the Statement or Statements Made by an Agent of the Defendant

Pursuant to Rule 801(d)(2)(C), a statement made by a person specifically authorized to speak for the defendant is equivalent to an admission by the defendant. Further, pursuant to Rule 801(d)(2)(D), a statement made by an agent of the defendant is a vicarious admission of the defendant if the statement is made within the scope of the agency and during the course of the relationship.

### 3. Non-hearsay Statements

The co-conspirator statement analysis also is not triggered when the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a) and when it is not hearsay. This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion."

Thus, a statement that is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). Accordingly, statements by alleged co-conspirators may be admitted into evidence without establishing the *Bourjaily* factual predicates, but with corresponding limiting instructions, when such statements are offered simply to show, for example, the existence,

---

[14] Other sections of Rule 801(d)(2) provide alternative bases of admissibility that may apply. Rule 801(d)(2)(B), for example, provides for the admissibility of "adopted" statements.

illegality, or nature and scope of the charged conspiracy.[15]  In addition, when words are being introduced as a verbal act, or as background for an alleged statement, they are not admitted for the truth of the matter asserted.  For that reason, they are not hearsay, and may be admitted.  *See, e.g., United States v. Robinzine*, 80 F.3d246, 252 (7th Cir. 1996).

## III.    THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF A CONSPIRACY

As charged in the Second Superseding Indictment, defendant Rod Blagojevich, Blagojevich's wife, defendant Robert Blagojevich, Christopher Kelly, Antoin Rezko, Alonzo Monk, Stuart Levine, Sheldon Pekin, Joseph Cari, Jacob Kiferbaum, William Cellini, John Harris, Deputy Governor A,[16] Individual I, Advisor A, Advisor B, and others [17] conspired to use the powers of the Office of the Governor of the State of Illinois to take and cause governmental actions in order to

---

[15] *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.  In some cases, statements by an alleged co-conspirator will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes.

[16] Throughout this motion, the government will refer to uncharged individuals and to certain entities by labels instead of their identities.  The government will use the same labels for these individuals and entities that were used in the Second Superseding Indictment.  To avoid confusion, the government has identified additional people who were not referenced in the Second Superseding Indictment beginning with the designation "Individual __."  Entities that were not in the Second Superseding Indictment have been given descriptive labels as well.   The government will provide the true identity of the names of individuals and entities who are not disclosed in this motion to the Court and to counsel for the defendants.

[17]   There are additional individuals that the government believes would properly be considered co-conspirators in the charged conspiracies or schemes that are not included on this list.  The government is not seeking to introduce statements by those individuals pursuant to Rule 801(d)(2)(E), so the government has not designated those individuals as co-conspirators for purposes of this proffer.  The government reserves the right to amend its list of co-conspirators, including to add additional co-conspirators, and simply provides the above list in furtherance of its proffer of evidence to demonstrate a conspiracy existed.

15

obtain financial benefits for themselves and others, including campaign contributions for Rod Blagojevich, and employment for Rod Blagojevich and his wife.  The government submits the following summary of evidence:[18]

### A. Efforts To Obtain Personal Benefits for Blagojevich and Campaign Contributions In Exchange For State Action (2002-04)

#### 1. Influence and Actions of Christopher Kelly and Antoin Rezko

Rod Blagojevich was first elected Governor of the State of Illinois in November 2002. Christopher Kelly and Antoin "Tony" Rezko played important roles in assisting Blagojevich in this campaign.  Kelly was part of Blagojevich's inner circle during the campaign and was one of the top fundraisers for Blagojevich.  Kelly oversaw most aspects of fundraising for the campaign, including ensuring that other individuals met their fundraising goals.  Rezko was also one of the top fundraisers for Blagojevich.

After Blagojevich became Governor in January 2003, Kelly and Rezko continued to play important roles in fundraising for Blagojevich.  In 2003 and 2004, Kelly and Rezko had the primary role in overseeing the efforts to raise money for Blagojevich.  They were heavily involved in organizing the large annual fundraising events that Blagojevich held in the summers of 2003 and 2004.  In that time frame, Blagojevich pushed Rezko and Kelly to raise funds in a variety of conversations.

Kelly and Rezko also had significant influence over aspects of state government during the

---

[18]/This summary is based on information contained in various interview reports, documents, and grand jury statements  obtained or created during the investigation, as well as transcripts of recorded phone calls and meetings.  Some of the communications described below took place through written means, and there were additional co-conspirator statements made in the form of emails, faxes, written contracts (including drafts), calendars, and other written forms not all of which are described in detail below.

transition period after Blagojevich won office and continuing after Blagojevich took office. Kelly and Rezko were part of the informal kitchen cabinet that Blagojevich used to make decisions, and had complete access to Blagojevich and/or Monk (Blagojevich's Chief of Staff during this period) to talk about any state issue they wished. Kelly and Rezko used their influence over state affairs. For example, Rezko and Kelly recommended and/or interviewed many of the people who were selected to top positions in Blagojevich's administration and were actively involved in the awarding of certain state contracts.

Kelly and Rezko also exercised significant influence over the appointments Blagojevich made to state boards and commissions. Monk was the primary person responsible for overseeing the selection process for filling boards and commissions vacancies. Kelly and Rezko each recommended many candidates for various boards and commissions, and Monk gave their recommendations great weight.

From what Blagojevich said about appointments to boards and commissions, Monk understood that Blagojevich viewed those appointments as an opportunity to reward big fundraisers or Blagojevich's supporters. Blagojevich consistently wanted to know who recommended a particular candidate for a board or commission slot. When Kelly and Rezko made their recommendations for people to be on boards and commissions, Monk knew that they were often rewarding people who had made contributions to Blagojevich or who were going to do so.

Rezko and Kelly demonstrated over time that they had more interest in certain boards than others and particularly that they were interested in the boards that controlled money, including the pension boards like the Teachers' Retirement System, the Illinois State Board of Investment, and the State University Retirement System. Rezko also had a significant interest in the appointments

17

to the Illinois Health Facilities Planning Board. Blagojevich gave Kelly and Rezko significant deference for their picks on those types of boards.

### 2. Solicitation of Joseph Cari

Joseph Cari was a lawyer with the law firm of Ungaretti & Harris and was also affiliated with a private equity firm called Healthpoint Capital ("Healthpoint"). Cari had been the national finance chair for the Al Gore presidential campaign in 2000 and had many fundraising contacts around the country.

In approximately late Summer 2003, Cari had a conversation with David Wilhelm, who had previously been involved in Blagojevich's campaign for governor. Wilhelm asked Cari to meet Kelly. Wilhelm told Cari that Kelly and Rezko were two key people who were close to Blagojevich. Wilhelm asked Cari to talk to Kelly about the mechanics of setting up a national fundraising operation for Blagojevich. Shortly after the conversation with Wilhelm, Cari met with Kelly and Wilhelm. Cari discussed with Kelly what it would take to build a national fund-raising operation for Blagojevich.

Shortly after meeting with Kelly, Cari had dinner with Stuart Levine, who was a member of a state pension board and an associate of Kelly and Rezko. Cari first met Levine in 2002 when Cari was obtaining funds from Levine's state pension board for Healthpoint and had kept in touch with Levine after that point. Levine was following up on Cari's meeting with Kelly and was gathering additional fundraising information. Levine told Cari the information would be shared with Rezko. Levine also told Cari that Rezko was helping Blagojevich fill State of Illinois board slots and that Levine owed Rezko for Rezko having helped get Levine on certain state boards.

18

Not long after meeting with Levine, Cari agreed to assist in a fundraiser being held for Rod Blagojevich in New York City. On the morning of the fundraiser in October 2003, Cari flew to New York City with Rod Blagojevich, Kelly, Levine, and others. During the plane ride, Cari had a conversation with Rod Blagojevich. Rod Blagojevich stated he had aspirations beyond being governor and that fundraising was the key to political success. Rod Blagojevich stated that Rezko and Kelly were Blagojevich's point people in coordinating fundraising and helping Blagojevich's supporters. Blagojevich informed Cari that Blagojevich could award contracts, legal work, and investment banking to help with Blagojevich's fundraising. The conversation ended with Blagojevich stating that he wanted the dialogue with Cari about fundraising to continue and that Rezko and Kelly would follow up with Cari.

At the fundraiser that evening, Cari had a conversation with Levine. Among other things, Levine informed Cari that there was a plan in place that Rezko and Kelly, on behalf of Blagojevich, would help pick lawyers, consultants, and others to get state business and then request campaign contributions from those who received State work.

After the fundraiser, Cari met with Rezko at Rezko's offices in Chicago. Rezko informed Cari that Rezko was following up on the conversation that Cari had with Blagojevich regarding fundraising. Rezko informed Cari that Rezko had a hand in choosing law firms, consultants, and other state work and that Monk would assist with implementing those choices. Rezko informed Cari that the Blagojevich administration would be helpful to Cari's financial interests if Cari would agree to assist Blagojevich raise money on a national level. Cari declined Rezko's offer.

After meeting with Rezko, Cari eventually met with Kelly in March 2004. Kelly informed Cari that Kelly was following up on the conversations Cari had with Blagojevich, Rezko, and

19

Levine. Kelly, like Rezko, asked Cari to raise money for Blagojevich on a national level. When Cari declined the request, Kelly stated that Cari agreeing to help raise funds would be good for Cari's law firm and private equity firm and that Cari could have whatever work from the State that Cari wanted in exchange for Cari's help in raising funds for Blagojevich. Cari declined Kelly's offer.

In addition to the above, Cari had a variety of conversations with Levine in which Levine reiterated statements related to Rezko controlling the disbursement of State money or work.

### 3. Attempts to Obtain Money or Campaign Contributions Through State Action

Blagojevich, Rezko, Kelly, and Monk had conversations, individually and collectively, about how the four of them could make money from their control over the State of Illinois government. In those conversations, Blagojevich, Rezko, Kelly, and Monk discussed a number of specific ideas for making money, such as through operating businesses that would get state money in different ways or receiving fees from people who did business with the state. Blagojevich, Rezko, Kelly, and Monk did not expect to have to invest significant money in any of these deals; instead, they were simply looking to collect money from the deals in the form of a finder's fee or from revenue that might be generated from the deals. As a general matter, Rezko was the one who was trying to set up the money-making arrangements and Kelly and Rezko were the most knowledgeable about how the plans would work. Blagojevich and Monk would then use their power and authority in state government as needed to assist whatever plans Rezko and Kelly put in place.

The conversations about making money from state action began before Blagojevich actually won the election in 2002. Kelly brought up the idea to Monk in 2002, when it seemed pretty certain that Blagojevich would win. In that conversation, Monk understood Kelly to suggest that Kelly,

Monk, Blagojevich, and others could benefit if Blagojevich won the election. Kelly said that there was money to be made from Blagojevich being Governor and that the Republicans had been doing the same for a long time.

There were occasions after Blagojevich became Governor that Blagojevich, Kelly, Monk, and Rezko all met to discuss their efforts to make money from state action. For example, the four men met in a conference room at the offices of one of Rezko's businesses in about mid to late 2003. During the meeting, Rezko led the discussion, standing at an easel or chalkboard and listed at least three or four different ideas or plans to make money being developed by Rezko that involved some kind of state action. At times, Kelly got up during the meeting and clarified or added to things that Rezko was saying. Blagojevich mostly listened during the meeting, but was engaged. As Rezko talked, he indicated how much money Blagojevich, Kelly, Rezko, and Monk could hope to make from the different ideas. The amounts that were associated with the different ideas were typically in the hundreds of thousands of dollars per deal, which would be evenly split four ways.

At times, Blagojevich, Kelly, Rezko and Monk also talked individually about their efforts to make money in a variety of ways. Blagojevich, Kelly, Rezko, and Monk stopped talking about the ideas about making money directly from their control over the State at some point after they learned that Stuart Levine had been confronted by the FBI in the spring of 2004, as explained in more detail below.

a.       <u>2003 Pension Obligation Bond Kickback</u>

One of the ways in which Blagojevich, Rezko, Kelly, and Monk tried to obtain money from their control over the State of Illinois was related to the State's re-financing of $10 billion in Pension

Obligation Bonds ("POB") in 2003. This was one of the money-making ideas that was discussed in meetings involving all four men.

Blagojevich had the power to decide which bond firms would have roles in the POB offering. Illinois state administrators determined that there were a number of investment firms, including Bear Stearns, that were qualified to handle the largest share of the bond sales. Initially, state administrators planned to sell the POB bonds in three different waves, depending on the market conditions. Kelly and Rezko advocated to Monk that Bear Stearns should be chosen as the firm that would take the lead on the first round of bond sales, which would likely mean that Bear Stearns would make the most money of the firms working on the first round of sales. Monk initially understood that Kelly and Rezko were pushing Bear Stearns because either Bear Stearns would make a political contribution to Blagojevich or because Blagojevich, Kelly, Rezko, and Monk would make money if Bear Stearns were chosen as the lead. Monk went through the list of potential firms with Blagojevich, and told him that Kelly and Rezko wanted Bear Stearns to be the lead for the first round. Blagojevich decided that Bear Stearns would receive the lead role.

Monk also talked with Rezko and Kelly about other firms that were looking to participate in the $10 billion POB deal. In addition to Bear Stearns, Rezko and Kelly also pushed in favor of other firms, including law firms, to have other roles in the POB deal. Monk understood that Kelly and Rezko were looking to reward investment firms and law firms that had contributed to Blagojevich or might be willing to contribute.

Monk was also involved in discussions with Kelly and Blagojevich about the POB issuance on the day of the bond sale. On the day of the sale, state administrators suggested that the market conditions were so good that the State could issue all $10 billion in bonds that day. Blagojevich,

Kelly, and Monk met with several other state administrators to decide whether to sell all the bonds that day. Monk understood that it would be good for Bear Stearns if the State did issue all $10 billion in bonds that day because of Bear Stearns's role as the lead underwriter for the first round.

At one point during this meeting, Kelly spoke with Blagojevich separately from the group. Shortly after that, Blagojevich made the decision to issue all $10 billion of the bonds at once. Later that day, Kelly told Monk that Kelly had told Blagojevich when they were alone that letting Bear Stearns sell all $10 billion of the bonds would mean that Bear Stearns would make more money, and that there would be a benefit for the four of them, which Monk understood meant that Blagojevich, Kelly, Rezko, and Monk would make money if Blagojevich allowed the entire sale to go forward that day.

After the bonds were issued, Kelly, Rezko, and Monk had further discussions about the money that they would make as a result of the POB deal. Rezko told Monk that Individual A, an associate of Rezko's, was putting money in a separate account that would later be turned over to Rezko. Rezko indicated to Monk that Individual A either had received or was going to receive money from Bear Stearns for acting as a consultant in relation to the POB deal. Rezko and/or Kelly told Monk that Individual A was going to give Rezko $500,000, which Monk understood was for the help that Rezko had provided to Bear Stearns and Individual A relating to the POB deal.

In about 2004, Kelly told Monk that Kelly was "pissed off" at Rezko because Rezko needed $100,000 and took it from the Individual A account. Kelly indicated that he was upset because he thought Rezko's withdrawal of the money would somehow alert the authorities to the existence of the account, so Kelly said he told Rezko to put the money back. Kelly was not concerned that Rezko was taking money that belonged to Blagojevich, Monk, Rezko, and Kelly, but that Rezko's taking

of the money might alert the authorities. Kelly mentioned on more than one occasion to Monk that he was upset with Rezko over this matter. Kelly subsequently indicated to Monk that Rezko put the money back in the account.

Financial records indicate that on or about September 24, 2003, Individual A received approximately $809,000 from Bear Stearns as a finder's fee in connection with Individual A's work on the POB offering. Rezko then arranged for Individual A to make a $600,000 transfer of funds to Joseph Aramanda, a long-time friend and associate of Rezko's, on or about October 2, 2003, pursuant to a loan agreement between Individual A and Aramanda that Rezko had arranged to draw up. At Rezko's direction, Aramanda then transferred approximately $450,00 of the $600,000 he received from Individual A to various individuals and entities chosen by Rezko. Aramanda ultimately paid Individual A back in June 2004, shortly after Rezko arranged for Aramanda to receive another loan of approximately $600,000 from another associate of Rezko's who did business with the State of Illinois.

b.   <u>Teacher's Retirement System Kickbacks and Extortions</u>

Blagojevich, Kelly, Rezko and Monk also had discussions about how they could make money through their influence and control over the running of the state pension boards, particularly the Teacher's Retirement System of Illinois ("TRS"). TRS is a public pension plan created by Illinois law for the purpose of providing pension, survivor, and disability benefits for teachers and administrators employed in Illinois public schools except in the City of Chicago. The activities of TRS are directed by a Board of Trustees, which is made up of trustees appointed by the Governor as well as trustees elected by the beneficiaries of the pension plan.

24

Rezko and Kelly were able to obtain significant influence over the affairs of TRS through their relationship with Stuart Levine and his associates. Levine was a TRS trustee when Blagojevich took office, and was re-appointed to the TRS Board in May 2004 by Blagojevich at the urging of Rezko and Kelly. Rezko and Kelly used their relationship with Levine in an effort to make millions of dollars in kickbacks from people doing business with TRS and other state pension boards and to obtain campaign contributions for Blagojevich. The conspirators planned to obtain the kickbacks in this scheme from the finder's fees that were paid by investment firms seeking TRS investments – Levine arranged with the individuals that were going to receive those fees that they would give Levine a share in exchange for his help at TRS. In turn, Levine agreed to share those fees with Rezko and Kelly in exchange for the use of their influence over state matters on his behalf.

i.       The Consolidation of the Pension Boards

Levine and William Cellini, who had significant influence over TRS trustees, had effective control over the TRS Board prior to Blagojevich becoming governor. In approximately the spring of 2003, that control was threatened by the possibility that TRS would be consolidated with other state pension boards. In an effort to prevent that, Cellini told Rezko and Kelly that Cellini and Levine would use their influence on the TRS Board to help investment firms that Rezko or Kelly recommended receive investments from TRS, if, in exchange, Rezko and Kelly would use their influence to prevent consolidation. Levine understood from what Cellini said that Rezko and Kelly would seek to help investment firms that had or would make political contributions to Blagojevich. Cellini told Levine that Rezko and Kelly agreed to this arrangement. On April 12, 2004, law enforcement agents intercepted Levine talking with an associate of Cellini's about this arrangement

25

in the course of discussing how Levine and Cellini could maintain control over the TRS Board (Levine Call #16).[19]

Rezko and Kelly did, in fact, argue against the idea of consolidating the pension boards to Monk and Blagojevich. In a meeting with Monk and Blagojevich, Kelly said that consolidation was a bad idea for several reasons. Kelly said that it would cut back on Blagojevich's ability to appoint people because there would be fewer positions to fill, which Monk understood to mean that Kelly was concerned that Blagojevich would have fewer board positions to award to contributors. Kelly was also concerned that consolidation of the pension boards would reduce the ability of Rezko and Kelly to control or influence the pension boards because there would be fewer board members who were appointed by Blagojevich on the recommendation of Rezko and Kelly. Monk understood that Kelly and Rezko had influence, or would get influence, over how the pension boards spent their money through the appointments Blagojevich had made or would make to the pension boards. Monk further understood that with that power, Kelly and Rezko would be able to influence which entities could provide financial and legal services to the pension boards, and that this influence would either allow Rezko and Kelly to make money directly for Blagojevich, Rezko, Kelly, and Monk and/or to reward campaign contributors to Blagojevich.

Monk also had separate conversations with Rezko in which Rezko indicated that he was against the idea of consolidating the pension boards. Rezko's main concern was that there would be fewer people Blagojevich could appoint and that, therefore, Rezko, Kelly, and Blagojevich would have less influence.

---

[19] Law enforcement agents intercepted three different phone lines at Levine's home in April and May 2004 pursuant to court-authorized wiretaps. The government will refer to calls intercepted over those wiretaps as "Levine Call #__" for purposes of this motion.

Ultimately, after learning about other political opposition to the consolidation idea, Blagojevich decided not to support it. Either Blagojevich or Monk then told Kelly and/or Rezko that the consolidation was not going to happen and they should not worry about it.

After the consolidation proposal faltered, there were occasions when Rezko or Kelly provided names of funds or individuals to Levine. Levine brought those funds or individuals to the attention of TRS staff and otherwise tried to help those funds or individuals, although TRS was unable to invest with those firms.

Lobbyist A, a lobbyist with significant ties to Blagojevich, also had conversations with Kelly about access at TRS. In about early 2004, Lobbyist A had relationships with two individuals who were involved in entities that were interested in being considered for investment by the TRS board. Lobbyist A contacted Kelly to get information and determine who was on the TRS board. In approximately March 2004, Lobbyist A met Kelly and asked how his clients could get on the list for consideration at TRS. In response, Kelly said, in essence, that TRS was Rezko's area. Kelly then called Rezko. Rezko did not answer, and Kelly left a message. Later in the meeting, Kelly said that Rezko had returned his call and told him it would be $50,000 to get on the list of recommended funds. Lobbyist A understood Kelly to mean that there needed to be a $50,000 contribution made to Friends of Blagojevich.

        ii.     <u>Rezko/Levine/Kelly Agreement on TRS Kickbacks</u>

Beginning in about the summer of 2003, Rezko and Levine arranged to help several investment firms seeking TRS money so that Rezko and Levine could get kickbacks in the form of a share of finder's fees that the investment firms would pay to individuals working with Rezko and Levine. On April 14, 2004, Levine and Rezko had a meeting at the Standard Club in Chicago,

27

Illinois (the "Standard Club Meeting"). In that meeting, Levine told Rezko about a series of kickbacks that Levine had either arranged to receive or planned to seek from individuals or entities that wanted investments from TRS. Levine offered Rezko a share of those fees in exchange for Rezko's continued support and understood that Rezko agreed to this proposal. Levine further understood that Rezko would be sharing those fees with Kelly, and Levine discussed the matter with Kelly at Rezko's offices after the Standard Club Meeting.

At some point between mid-2003 and early 2004, Kelly talked to Monk about how the Republicans had used state action to make money. In that conversation, Kelly referenced one of the boards on which Levine served - either TRS or the Illinois Health Facilities Planning Board. Kelly told Monk that Levine was a smart guy and knew how to get things done, which Monk understood to mean that Levine knew how to get the board to do certain things that would help Levine make money. From what Kelly said, Monk understood that Kelly had recently been talking with Levine and may have just left a meeting with Rezko and Levine.

Levine subsequently spoke about the Standard Club meeting with other people, including his friend and business partner, Robert Weinstein, who Levine planned to use to conceal Levine's receipt of the kickbacks. For example, in a call intercepted on April 17, 2004 (Levine Call #196), Levine told Weinstein how much money Levine expected to make from his corrupt deals with Rezko ($3.9 million), that the fees would be routed to Weinstein first, and that Weinstein would then share the fees with Levine. Similarly, on April 21, 2004 (Levine Call #328), Levine talked further with Weinstein about his relationship with Rezko and TRS, and how they were making money together.

As part of Rezko's agreement to help Levine at TRS, Rezko used his influence to help ensure that Levine was re-appointed to the TRS Board in May 2004 and otherwise ensure that he and

Levine had a majority of votes on the TRS Board. In particular, Rezko called Jill Hayden, the Director of the state's Office of Boards and Commissions to check on the status of Levine's re-appointment to the TRS Board. Rezko told Hayden to move Levine's re-appointment along and said that he had already talked to Monk. Hayden spoke to Monk about Levine's re-appointment and informed Monk that Rezko had claimed to have spoken with him already. Monk gave Hayden the approval to re-appoint Levine to the TRS Board.

### iii.    Glencoe Capital Kickback

The first time that Levine agreed to help use his influence and position at TRS in exchange for benefitting Rezko and himself involved a $50 million investment that the TRS Board agreed to make with an investment firm called Glencoe Capital in August 2003. Levine arranged with Sheldon Pekin, who worked as a finder for Glencoe Capital, that Pekin would share the finder's fee that Pekin would receive from Glencoe Capital if TRS invested money with Glencoe Capital. Levine then used his influence with TRS to help Glencoe Capital, and told Rezko about the potential fee.

After Glencoe Capital received its $50 million investment, Rezko told Levine that Aramanda would receive Rezko's share of Pekin's fee. Rezko subsequently arranged for Aramanda to meet with Pekin, and Pekin made two separate payments of $125,000 to Aramanda (reflecting 2/3 of the $375,000 fee that Pekin received from Glencoe Capital) in March 2004 and April 2004. Aramanda never did any work to justify any payment from Pekin to Aramanda.

Pekin and Aramanda originally agreed that Pekin would pay Aramanda in at least two installments. Pekin paid the first installment as they had planned on about March 4, 2004. After

Aramanda received that payment, he discussed it with Rezko. At Rezko's direction, Aramanda made payments of at least $60,000 to individuals or entities chosen by Rezko.

Aramanda then contacted Pekin in late April 2004 when Aramanda believed that the next installment was due. Pekin, however, said that the payment would be delayed and made a sarcastic comment to the effect that "Christmas come early," which Aramanda understood was a reference to the fact that Aramanda had not done any work to obtain the payment. Aramanda informed Rezko that Pekin was refusing to make the payment at that time and Rezko in turn contacted Levine about Pekin's refusal to make the payment. Levine then pressured Pekin to make the payment, including on a phone call on April 26, 2004 (Levine Call #411). Shortly after that call, Pekin called Aramanda and confirmed that Pekin would make the second payment, which Pekin then reported to Levine (Levine Call #43). Pekin subsequently gave Aramanda a second $125,000 check.

Around the date of that second payment, Rezko and Aramanda spoke again about Aramanda's participation in receiving finder's fees from TRS investments. Rezko had originally suggested that Aramanda could participate in a business where Aramanda would act as an intermediary with TRS and receive fees relating to TRS investments with different firms. Rezko had subsequently indicated that the payments from Pekin would be part of this business opportunity and that Aramanda could work with Pekin to obtain more fees, which Aramanda understood would be generated at least in part through Rezko's contacts with the Blagojevich administration. In their conversation around the date of the second payment, Rezko explained that he thought that there would be more opportunities in the intermediary business, and that Rezko could introduce Aramanda to a lot of Rezko's connections. Rezko offered Aramanda a $250,000 annual salary to run the business. Aramanda thought that this was a low salary in light of the amount of fees that Rezko had

suggested the business would generate, and asked Rezko what was going to happen to the rest of the money. Rezko indicated that there were other people involved in addition to himself, and eventually identified Blagojevich, Kelly, and Monk as additional people that would get a share of the money generated through the finder's fee business. Ultimately, Aramanda did not agree to work under that arrangement, and Aramanda did not receive any further fees.

iv.   <u>Sterling Financial Kickback</u>

Rezko and Levine also tried to help an investment firm called Sterling Financial receive an investment from TRS so that Rezko and his designees could receive a finder's fee from Sterling Financial. Levine learned about Sterling Financial from Michael Winter, who was a close business associate of Rezko's. Rezko had originally approached Winter in about late Spring 2003 and gave him a detailed explanation of TRS and other state pension boards. Rezko explained that Levine controlled the TRS Board and that Rezko wanted Winter to act as a finder of funds to invest with TRS and other state pension boards.

Winter located Sterling Financial and eventually made an arrangement where Winter would receive a finder's fee if Sterling Financial received an investment from TRS. As Sterling Financial looked like a promising investment, Winter met with Rezko and Daniel Mahru, who was Rezko's business partner, to discuss the financial arrangement. Winter, Rezko, and Mahru talked about splitting the finder's fees they expected to get from investment firms 1/3 apiece, but Rezko said that he should get more because he had to take care of other people, including Kelly.

Levine put pressure on TRS staff to approve Sterling Financial's proposed investment. Levine understood from Rezko that Levine was not going to share in any fee that Sterling Financial paid. Levine agreed to help anyway because he wanted to ingratiate himself with Rezko. After

31

Levine put pressure on the TRS staff to help Sterling Financial, TRS staff approved a $25 million investment in Sterling Financial, which was to be presented to the TRS Board for approval at a board meeting in May 2004.

Several weeks before the May 2004 TRS Board meeting, Winter talked with Kelly and Rezko about the potential TRS investment with Sterling Financial. Kelly said that Winter could not be named as the consultant for Sterling Financial who would receive a finder's fee because Winter shared an office with Rezko and because of Rezko's relationship with Blagojevich. Winter suggested that they name Myron Cherry, an associate of Winter's, as the person to receive the fee, and Kelly and Rezko agreed to this arrangement. As a result, about two weeks before the May 2004 TRS Board meeting, Winter told Sterling Financial that they should disclose Cherry's law firm as the entity that would receive a finder's fee from Sterling Financial for the TRS investment.

TRS staff raised concerns with Levine when they learned that Cherry's law firm had been disclosed as a finder by Sterling Financial even though Cherry had not had any role in helping Sterling Financial get the TRS investment. Levine, however, was not able to help Sterling Financial further because on May 20, 2004, FBI agents confronted Levine about his activities on various state boards.[20]

v.     Capri Capital Extortion

Capri Capital was a real estate investment management firm that had a long-standing relationship with TRS. In February 2004, Capri Capital was supposed to receive $220 million from TRS to manage. Levine acted to stall the allocation and planned with Rezko and Kelly to approach

_____

[20] Levine was subsequently indicted on related charges of fraud relating to TRS and the Illinois Health Facilities Planning Board and has since cooperated with the government after pleading guilty.

32

Thomas Rosenberg, a principal of Capri Capital, with a choice: if Rosenberg wanted to get the $220 million for Capri Capital, he was either going to have to make a $1.5 million donation to Rod Blagojevich or pay a finder chosen by Rezko, Kelly, and Levine a $2 million fee.

Rezko, Kelly, and Levine agreed that they would enlist William Cellini to approach Rosenberg, and Levine talked to Cellini about this task. Cellini agreed to help by convincing Rosenberg that he needed to talk with Levine (because Levine had the power to decide this issue) in order to get Capri Capital's $220 million. In calls on May 7, 2004 (Levine Call #736) and May 8, 2004 (Levine Call #754), Cellini updated Levine about Cellini's conversations with Rosenberg. In the May 8 call, Cellini said that Rosenberg was furious and threatened to blow the whistle on what Rosenberg perceived as a shakedown. Cellini told Levine about how Rezko and Kelly had been "essentially hammerin' people" to make political contributions in order to win State of Illinois contracts, how Cellini was a "nervous wreck" about it, and how Cellini and Levine needed to talk with Rezko and Kelly about Rosenberg's threats.

In a series of calls on May 10, 2004 (Levine Calls #146, 790, and 148), Kelly, Levine, and Cellini spoke and agreed to meet to talk about Rosenberg's complaints. On May 11, 2004, Kelly, Rezko, Levine, and Cellini all spoke together about Rosenberg. They decided that Rosenberg would get his $220 million and would not be approached for any money because Rosenberg was too powerful and dangerous. Rezko later told Levine that Rosenberg would never again get any state business as the consequence of his threat.

In a May 12, 2004 call (Levine Call #863), Levine told Cellini that he had met with Rezko and Kelly that day and talked about Rosenberg. Cellini said, "I think their position is, or at least Tony's is, okay so he may have to get something here, but he ain't gonna get anything more

33

[Rosenberg would not get any more business from the State of Illinois or TRS]." Levine agreed. Cellini also confirmed that Rezko had told Cellini that the "big guy said Rosenberg means nothing to him," which Levine understood was a reference to Blagojevich.

After the decision was made that Capri Capital would get its allocation, Levine ensured that Capri Capital received the allocation at the next TRS Board meeting.

vi.    <u>JER Extortion</u>

Levine and Joseph Cari also were involved in attempting to force an investment company called JER to hire a finder in order to obtain investment funds from TRS (JER had sought investment money from TRS without using a finder chosen by the conspirators, and TRS staff had approved the investment). As part of that extortion, to which Cari has pled guilty, Levine and Rezko agreed that Rezko would name the finder for JER, that JER would have to pay the finder if JER wanted to obtain TRS funds, and that Rezko and Levine would thereafter split certain of the money obtained from the finder after JER received TRS funds and paid the finder. Cari fully understood that the finder would not do any work for the money the finder would receive from JER but simply was going to be inserted into the deal as part of the fundraising plan that Blagojevich, Kelly, Rezko, and Levine had explained to Cari.

Cari and Levine had various conversations in furtherance of this part of the conspiracy that were captured on the intercept on Levine's phone. In particular, Levine and Cari discussed the need of JER to hire the "finder" or risk losing the TRS investment on May 6, 2004 (Levine Calls #134, 136, and 137) and on May 19, 2004 (Levine Call #1040). For example, on May 6, 2004 (Levine Call #136), Levine told Cari that while JER had an $80 million commitment and was on the "May schedule [meaning that the TRS investment in JER was scheduled to be approved at the May 2004

34

TRS Board meeting]," Levine could "change that [Levine would block the investment if JER did not hire the consultant]." Levine further indicated to Cari that "this is the kind of thing that, that could um, can um, ah, you know how upset people can get the political powers that be. Ah, so that's why I wanna wrap it up." Similarly, Levine had conversations with Rezko about the JER deal, as well as conversations with Rezko's designee, Charles Hannon, about how Hannon would receive Rezko's share of the JER fee.

Based on Cari's conversations with Blagojevich, Rezko, Kelly, and Levine, Cari informed various individuals at JER that JER needed to hire the finder or they would not get TRS funds, further explaining that "this is the way . . . in Illinois that it's done." Ultimately, JER refused to comply with the demand that JER hire a finder it did not need, and complained to TRS staff. After Levine was confronted by the FBI on May 20, 2004, he did not make any further efforts to obstruct the TRS investment with JER.

c.     <u>Illinois Health Facilities Planning Board Kickback</u>

The Illinois Health Facilities Planning Board (the "Planning Board") is a commission of the State of Illinois, established by statute, whose members are appointed by the Governor of the State of Illinois. During the relevant time period, the Planning Board consisted of nine individuals. State law required an entity seeking to build a hospital, medical office building, or other medical facility in Illinois to obtain a permit, known as a "Certificate of Need" ("CON"), from the Planning Board prior to beginning construction.

Rezko was able to obtain significant influence over the affairs of the Planning Board by arranging for Blagojevich to appoint five of Rezko's associates and/or friends, including Levine, as members of the Planning Board in 2003. Rezko and Levine subsequently agreed to use their

35

influence over the Planning Board to obtain a kickback of at least $1 million from a contractor, Jacob Kiferbaum, who wanted the Planning Board to award Mercy Hospital a CON to build a new hospital. Rezko and Levine were able to arrange for Mercy Hospital to receive its CON at the April 2004 Planning Board meeting, but their scheme was interrupted by the FBI before any kickback was paid

### i. Control over the Planning Board

Levine was on the Planning Board when Blagojevich became governor, but his term was due to expire in 2003. Levine sent a message to the Blagojevich administration through Cellini that he wanted to be re-appointed. Levine later heard from both Kelly and Cellini that he would be re-appointed, and Levine was re-appointed to the Planning Board in the Fall of 2003.

After Levine was reappointed, he shared a private plane ride from New York to Chicago with Blagojevich and Kelly. Levine, Blagojevich, and Kelly were the only passengers on the flight. At the beginning of the flight, Levine thanked Blagojevich for reappointing him to the Planning Board. Blagojevich responded (in Kelly's presence) that Levine should only talk with "Tony" [Rezko] or "Chris" [Kelly] about the board, "but you stick with us and you will do very well for yourself." Levine understood from Blagojevich's manner of speaking and words that Blagojevich did not want Levine to talk to Blagojevich directly about anything to do with the boards, but that Levine should talk to Rezko or Kelly. Levine also understood that Blagojevich meant that Levine could make a lot of money working with Blagojevich's administration. Blagojevich did not seem to expect a response from Levine, and Kelly then shifted the conversation to something else.

Around the time that Levine was reappointed, Rezko told Levine that he expected to control the Planning Board. Rezko said that he had discussed the makeup of the Planning Board with

Thomas Beck, who was the Chairman of the Planning Board. Before one of the Planning Board meetings, Beck talked to Levine about how there were five members of the Planning Board who were Rezko's people, including Levine and Beck. The other three individuals who would vote as Rezko wished were Fortune Massuda, Imad Almanaseer, and Michel Malek. Documents and testimony from individuals in Illinois state government who helped select candidates for boards and commissions positions, including the Planning Board, confirm that Rezko was the individual responsible for selecting those five individuals to be appointed to the Planning Board. Since it took five votes to approve any CON, Rezko's people effectively controlled what the Planning Board did. Beck typically indicated to Levine and the other three members of Rezko's voting bloc the items on the Planning Board agenda that Rezko cared about and how Rezko wanted them to vote.

### ii.    Mercy Hospital Kickback

Levine first learned that Mercy Hospital needed a CON in late 2003 after he learned from Kiferbaum that Kiferbaum had the opportunity to receive a contract from Mercy Hospital to build its new hospital if it received permission to build. Levine and Kiferbaum agreed that Kiferbaum would pay a kickback to Levine if Levine were able to help Mercy Hospital receive its CON. Levine later told Rezko about Kiferbaum's willingness to pay a kickback if Mercy Hospital received its CON, and Rezko agreed to make sure that Mercy received its CON. Levine also tried to help Kiferbaum obtain the building contract from Mercy Hospital.

Levine worked with Rezko to ensure that the other four members of Rezko's voting bloc on the Planning Board voted in favor of Mercy Hospital's CON, including in a call with Beck on April 19, 2004 (Levine Call #277). On April 21, 2004, the Planning Board met to consider the Mercy Hospital CON application. When Beck expressed concern about voting in favor of Mercy Hospital

that morning, Levine arranged for Rezko to speak with Beck to force his vote. Levine also intervened during the actual voting to push Almanaseer to vote in favor of Mercy Hospital, telling Almanaseer that Rezko wanted him to vote yes. As a result of those efforts, Mercy Hospital received the five votes it needed (all from Rezko's voting bloc) to obtain its CON. That night, Levine talked to Weinstein (Levine Call #328), who was going to play a role in laundering the kickback from Kiferbaum, and speaking about the Mercy vote said that "none of them [the other 4 members of Rezko's bloc on the Planning Board] know that it's Tony and me. They know that Tony's giving the orders."

Ultimately, while Mercy's CON was approved, Kiferbaum and Levine did not finalize the kickback arrangement prior to the FBI's interview of Levine. As a result, Kiferbaum never paid Levine any portion of the kickback.

### iii. Control of the Planning Board After Mercy Hospital Vote

Rezko, Kelly, and Levine continued to talk about how the Planning Board was to be run after the Mercy Hospital vote. On May 18, 2004 (Levine Call #1011), Rezko and Levine talked about a sixth Planning Board member, Dana Lynn Rice, who they wanted to vote with the rest of Rezko's voting bloc. Prior to that call, Kelly had called Levine to discuss whether Levine would talk with Rice. Rezko, however, indicated that Rezko wanted Beck to talk with Rice, not Levine and that "it should be [Beck] communicating with the others [the other members of Rezko's voting bloc]." Rezko said that he wanted the focus of the Planning Board to be on Beck, not Levine, although "you and I will still do what we need to do [Rezko and Levine would continue to make money through kickbacks at the Planning Board]." Rezko explained that Rice had been told to "take directions" from Levine, but Rezko wanted Levine to call Rice to tell her to take direction from Beck. Levine

agreed to tell Rice to follow Beck's lead, saying that "we'll do it the way we have been handling it in the last couple of months."

                d.        Solicitation of Campaign Contributions from Ali Ata In Exchange for <u>a State of Illinois Position</u>

In or about 2002, Ali Ata had several conversations with Rezko regarding the possibility of a high level appointment for himself in state government should Rod Blagojevich be elected. At Rezko's direction, Ata put together a list of three state agencies to which he would be interested in being appointed.

In or about August 2002, Ata held a small fund-raising event for Blagojevich that Blagojevich attended. In advance of that fund-raising event, Ata committed to Rezko that Ata would raise $25,000 at that event, which he eventually did, personally contributing at least approximately $5,000.

Later that year, Rezko approached Ata for additional monetary support for Blagojevich. Ata agreed to contribute an additional $25,000 to the campaign of Blagojevich. Ata, subsequently and by prior arrangement with Rezko, brought a check in this amount to Rezko's Rezmar offices on Elston Avenue in Chicago. After he arrived at the Rezmar offices, Ata was greeted by Rezko, to whom he handed the check in an envelope. Rezko, carrying the check, ushered Ata into a conference room where Ata met with Rezko and Blagojevich. Rezko placed the envelope containing Ata's $25,000 check to Blagojevich's campaign on the conference room table between himself and Blagojevich and stated to Blagojevich that Ata had been a good supporter and a team player and that Ata would be willing to join Blagojevich's administration. Blagojevich expressed his pleasure and acknowledged that Ata had been a good supporter and good friend. Blagojevich, in Ata's presence, asked Rezko if he (Rezko) had talked to Ata about positions in the administration, and Rezko

responded that he had.

After this meeting, Ata completed an application for a state appointment. In or about early 2003, Rezko informed Ata that he was going to be appointed to head the state Capital Development Board. Rezko subsequently informed Ata that this position was going to someone else and that another position would have to be found for Ata. Later, Rezko discussed an opportunity for Ata with the newly formed Illinois Finance Authority ("IFA").

In or about July 2003, Rezko asked Ata to make an additional $50,000 contribution to the campaign of Blagojevich. Ata agreed to contribute the same amount as he had previously, namely $25,000, and gave Rezko a check payable to Blagojevich's campaign on or about July 25, 2003. Thereafter, Ata had a conversation with Blagojevich at a large fund-raising event at Navy Pier. During this conversation, Blagojevich told Ata that he had been a good supporter, indicated that Blagojevich was aware that Ata had made another substantial donation to Blagojevich's campaign, and told Ata that Blagojevich understood that Ata would be joining Blagojevich's administration. Ata responded that he was considering taking a position, and Blagojevich stated that it had better be a job where Ata could make some money.

Thereafter, Rezko told Ata that he could have the Executive Director position of the IFA on the condition that Ata agree to report to Rezko. Ata agreed, and thereafter met regularly with Rezko to keep him apprised of developments relating to the IFA and other matters. Ata began working in an unofficial capacity in this position in late 2003, and was officially appointed the Executive Director of the IFA in January 2004 after the IFA Board voted on his nomination. Thereafter, Ata continued to meet with Rezko regularly as previously agreed.

After Rezko learned that he was being investigated, Rezko spoke with Ata on several

occasions about not cooperating with the federal investigation. From those conversations, Ata understood that Rezko was trying to have the United States Attorney replaced, and that something negative would happen to those who cooperated with the investigation. Around the time that Ata received a grand jury subpoena, Ata was also contacted by associates of Rezko about the subpoena, which Ata understood reflected Rezko's wish that Ata not cooperate with the FBI. As a result of those conversations, Ata lied when he was interviewed by the FBI about a series of topics related to Blagojevich and Rezko.

### B. Steering Money to Blagojevich's Wife

#### 1. Real Estate Transactions Involving Blagojevich's Wife

After Blagojevich, Kelly, Rezko, and Monk learned that Levine had been confronted by law enforcement agents in May 2004, their discussions about how to make money shifted. In particular, there were more discussions about how Blagojevich, Kelly, and Monk could benefit from a real estate development that Rezko was working on at Roosevelt and Clark in Chicago. Rezko talked about different ways that Blagojevich, Kelly, and Monk could benefit from the project, such as by having Blagojevich's wife work on marketing the project or by Monk working on the project after he left state government.

Beginning in the Fall of 2003, Rezko had also arranged for Blagojevich's wife to receive money on various real estate transactions that she did not earn. At the time, Rezko owned (with a partner) a real estate development business called Rezmar. Blagojevich's wife worked at times as a real estate broker and owned a small firm ("Blagojevich's Wife's Firm" or "her company") to conduct her real estate work.

41

a.     <u>August 2003 Unearned Commission</u>

Around August 27, 2003, Rezko told Individual B, the Chief Financial Officer for Rezmar, that Rezko wanted to get a check to Blagojevich's wife. Rezko asked Individual B how Rezmar might be able to associate the issuance of the check with one of Rezmar's projects. Rezko did not tell Individual B that Rezko had an agreement with Blagojevich's wife that required him to pay her or her company money.

Based on Rezko's instructions to find a payment that looked legitimate, Individual B determined that a payment of $14,369.50 could be made to Blagojevich's wife's firm and made to look as if it were a 2½ percent commission on the sale of a housing unit that had recently closed in a development project that Rezko owned through another company. Individual B did not believe that either Blagojevich's wife or her company had done anything with respect to that sale, which had actually been handled by a sales agent who had an exclusive agreement to broker the sales of the units in the development project.

Individual B went back to Rezko and told him that a unit in the development project had recently closed and a check could be issued to Blagojevich's Wife's Firm as a commission related to that transaction if Rezko desired. Rezko agreed. Individual B directed Rezmar staff to prepare a $14,369.50 check made payable to Blagojevich's Wife's Firm. After the check was prepared, Individual B gave the check to Rezko to sign and said that Rezko should sign the check. Rezko said that he would. Individual B did not sign the check because he questioned the appropriateness of the check, and he did not believe that Blagojevich's wife had done anything on this transaction. The

$14,369.50 check was ultimately deposited into a bank account in the name of Blagojevich's Wife's Firm.

b.     <u>Unnecessary Retainer Fees From Rezmar</u>

In around October 2003, Blagojevich's wife entered into a contract on behalf of her company with Rezmar in which Blagojevich's Wife's Firm agreed to perform unspecified real estate brokerage services to Rezmar in exchange for a monthly retainer of $12,000 plus the possibility of additional commissions depending on the amount of deals brokered.  Beginning in October 2003, at Rezko's direction, Individual B prepared a series of $12,000 checks pursuant to that agreement, which Individual B delivered to Rezko or his assistant.  Ultimately, Rezmar issued 8 separate $12,000 checks, totaling $96,000, to Blagojevich's Wife's Firm on approximately a monthly basis from October 2003 through May 2004.  Those checks were deposited into a bank account held by Blagojevich's Wife's Firm.  In about May of 2004, Rezko told Individual B that Rezmar would not be issuing any more of these monthly checks.

Employees at Rezmar were not aware of services that Blagojevich's Wife's Firm provided to Rezmar that justified the payments made under the contract.  For example, Individual B was not aware of any properties that Rezmar acquired based on Blagojevich's wife's efforts from October 2003 through May 2004, and understood that other Rezmar employees and officers were responsible for identifying real estate opportunities prior to and during this period of time.

Michael Winter, who was a senior consultant at Rezmar, observed Blagojevich's wife in the Rezmar offices from time to time, although Blagojevich's wife often had a child with her and usually left soon after she arrived.  At some point after the spring of 2003, Rezko asked Winter to involve Blagojevich's wife in business activities that Winter conducted on behalf of Rezmar.  Winter

43

knew that Blagojevich's wife was being paid by Rezmar. Rezko said to Winter words to the effect that "We are paying [Blagojevich's wife] this money, I would like you to get her involved in things that you are doing" which Winter understood was a reference to the money that Blagojevich's wife was making under her contract. While Winter made a few efforts to include Blagojevich's wife in his business affairs, to his knowledge, she was not able to make a significant contribution. On a few occasions, Rezko told Winter that Blagojevich's wife had referred a property to Rezmar to see if Rezmar was interested in buying and developing the site. To Winter's knowledge, the properties Blagojevich's wife identified were not suitable for Rezmar, and Rezmar did not purchase any of the properties that Blagojevich's wife referred. At one point, Winter told Rezko that he thought that Rezmar's hiring of Blagojevich's wife was not a good idea. Winter said that he thought that it was a bad idea to have someone on retainer for the type of work that it was contemplated that Blagojevich's wife would be doing for Rezmar.

Monk also spoke with Blagojevich, his wife, and Rezko about Blagojevich's wife's contract with Rezmar. Blagojevich was concerned that there might be the perception that his wife was a ghost payroller if she did not go into Rezko's offices. Monk had conversations with Blagojevich and his wife about the need for her to actually go into the office to work on a regular basis. The problem with that approach, however, was that Blagojevich's wife was taking care of their infant daughter.

Monk talked with Rezko about the issue of Blagojevich's wife going to the office. Rezko was willing to do whatever it took to get her money, whether it was from a monthly retainer or through hiring her to work on his development at Roosevelt and Clark. Rezko did not seem to care

if she actually did anything to earn the money. Rezko was only concerned about ensuring that Blagojevich did not have to worry about his finances.[21/]

          c.     Unearned January 2004 Commission

In or about January 2004, while Rezmar was paying Blagojevich's wife $12,000 a month, Rezko directed to Blagojevich's wife a payment of $40,000, purportedly for brokerage services in connection with the sale of property at 1101 West Lake Street, Chicago, Illinois, even though the sale of the property had been arranged without her assistance. Individual C, a lawyer and lobbyist connected to Rezko, purchased two units of a building at 1101 West Lake Street in Chicago, Illinois from Individual D and Individual E.

Individual C did not negotiate the purchase price for the two units on Lake Street with either Individual D or Individual E but instead agreed to pay the asking price. The asking price that Individual C agreed to pay did not include a brokerage fee because Individual C had not used a broker to identify or negotiate the purchase of the units. Individual C found and negotiated the purchase of the two units on his own. Although Individual C did not need a broker, Individual C offered Rezko the opportunity to be a broker on his purchase of the two units. Rezko directed the brokerage fee to Blagojevich's wife.

Individual D and Individual E refused to pay any part of the brokerage fee. So, the price of the two units was increased to cover the cost of the brokerage fee. None of the individuals involved

---

[21/] Beginning in about the spring or summer of 2004, Rezko also provided Monk with cash in amounts of about $10,000 on seven to nine occasions. Rezko's payments extended through at least 2005. Rezko never suggested that Monk would have to pay Rezko back and Monk understood that the money that Rezko provided was a gift, not a loan. Monk discussed Rezko's cash payments with Kelly, but not Blagojevich.

in the sale of the units was aware of Rezko, Rezmar, Blagojevich's wife, or her company doing any work to earn the brokerage fee.

At the closing of the two units, on January 19, 2004, a check for $40,000 was made payable to Blagojevich's Wife's Firm. That check was sent back to the title company with instructions that the check be issued to Rezmar. On January 21, 2004, the title company issued a new $40,000 check to Rezmar Realty. After Rezmar received the $40,000 check, Rezko directed Individual B to deposit the check into a Rezmar account and to write a $40,000 check to Blagojevich's Wife's Firm. On January 22, 2004, Individual B wrote a check to Blagojevich's Wife's Firm for $40,000. The check stub indicates that it was "assignment of funds." On January 23, 2004, that check was deposited into a bank account held by Blagojevich's Wife's Firm. On the same day, Blagojevich's wife wrote a $40,000 check to herself from her company's bank account and deposited the check into her personal bank account. On or about January 24, 2004, Blagojevich's wife then wrote a series of checks totaling $38,010 from her personal bank account to a number of vendors who had performed work on the Blagojevich home.

## 2. Efforts to Obtain Employment for Blagojevich's wife

After there was significant publicity in the media about the real estate business of Blagojevich's wife, Blagojevich tried to obtain a job for her by using his power as Governor. After John Harris became Blagojevich's Chief of Staff in 2006, Blagojevich talked to Harris and others within the Office of the Governor about getting Blagojevich's wife a job. Blagojevich wanted to hire his wife at the State of Illinois. Harris thought this was a terrible idea and told Blagojevich to talk to Individual F, a political consultant who worked with Blagojevich, about this, because Harris

believed that Individual F would tell him it was a terrible idea.  Individual F told Blagojevich that he couldn't hire his wife at the State.

In approximately the beginning of 2008, Blagojevich would often threaten to put his wife on a paid state board, particularly the Pollution Control Board, if Harris and others within the Office of the Governor were not successful in finding her suitable employment.  The Pollution Control Board was a high-paying state board, with an annual salary of over $100,000 per year.  The position involved a considerable workload and weekly meetings, as well as specific qualifications which Blagojevich's wife did not meet.  When Harris told Blagojevich that his wife did not meet the qualifications for the board, Blagojevich was unhappy and mentioned another board member whom he thought was unqualified and basically said that if this other unqualified person could sit on the board, then his wife should be able to as well.  Harris told Blagojevich that he had not made that other appointment (it had happened before Blagojevich was Governor) and that even if that individual was not in fact qualified, it didn't offer an excuse to put Blagojevich's wife, who was definitely unqualified, on the board.  Harris also explained to Blagojevich that the Pollution Control Board met regularly and involved considerable work, which Blagojevich said was not the type of paid position that he was looking to get his wife.

In approximately mid-2008, Blagojevich wanted to get his wife a job with an entity that did business with the State of Illinois that could use her Series 7 license, which is a requirement in the United States for individuals to act with as a broker-dealer and communicate with retail investors.  Harris told Blagojevich that Blagojevich's wife could not work with an entity that did business with the State of Illinois.  Despite this, Blagojevich asked Harris for a list of the financial houses that did business with the State.  Blagojevich also asked Harris if he knew anyone to whom Harris could

47

introduce his wife in order to help her get a job using her Series 7 license. In response to this request, Harris set up a meeting for Blagojevich's wife with Individual G, who worked at a Financial Institution 1, to advise her on the industry in general. Individual G met with Blagojevich's wife but did not do anything further for her. Blagojevich's wife complained to Blagojevich about what Financial Institution 1 was doing/not doing with respect to her. Blagojevich told Harris that he was upset with what Financial Institution 1 was doing and said he did not want Financial Institution 1 to get any more business from "us," meaning the State of Illinois, because of Financial Institution 1's failure to help his wife. Harris did not prevent Financial Institution 1 from getting further business with the State but Harris also did not tell Blagojevich when Financial Institution 1 was putting in for or awarded State business for fear that he would follow through on his threat to keep Financial Institution 1 from getting state business.

In addition to Financial Institution 1, Harris also spoke with Individual H, an executive at Financial Institution 2, about Blagojevich's wife's series 7 license. This meeting was in person at Individual H's office. Harris asked him to keep her in mind if he heard anything about someone who did not do State of Illinois business. Individual H recommended a company called Financial Institution 3. Harris relayed this information to Blagojevich's wife, who said that Financial Institution 3 was the company who had sponsored her for her Series 7 license. Harris told Blagojevich and his wife that he had asked Individual H to keep Blagojevich's wife in mind and this had been his response. Blagojevich was very upset and told Harris that he wanted Individual H and Financial Institution 2 to no longer get anything from the State of Illinois. Harris told Blagojevich that was not something that was within their control because Individual H had business through the

state pension funds and Blagojevich did not control those decisions. Blagojevich was not happy about that.

### C. Blagojevich Efforts To Extort Campaign Contributions (2006-08)

Blagojevich made a series of attempts in 2006-08 to extort campaign contributions from potential donors who were seeking state action from Blagojevich.

### 1. Attempted Extortion of United States Congressman A

In late 2005, United States Congressman A was assisting the Academy of Urban School Leadership ("AUSL") obtain a $2 million grant from the State of Illinois. AUSL, sometimes referred to as the Chicago Academy, runs various schools and helps train teachers to teach at other schools. The $2 million grant was to be used to refurbish athletics fields at an AUSL-sponsored high school. During the relevant time period, AUSL was in United States Congressman A's congressional district.

Ultimately, in late 2005, United States Congressman A and AUSL succeeded in obtaining Blagojevich's agreement that the State of Illinois would provide the $2 million grant. A press conference announced the grant. Based on Blagojevich's agreement to fund the grant, AUSL began hiring contractors to do the construction work and, in Spring 2006, began the construction work.

Although AUSL incurred significant expenses as part of the construction, the grant money was not forthcoming from the State of Illinois. By the Fall of 2006, contractors were threatening to stop work based on AUSL's failure to pay them and AUSL was desperately trying to obtain the grant money that Blagojevich had promised.

49

After AUSL had begun construction, Deputy Governor B began to get phone calls from United States Congressman A and others working for United States Congressman A about the status of the funding for the grant. United States Congressman A and others informed Deputy Governor B that it was problematic that the grant had not been funded and that AUSL had started working on the project but did not have money to pay for the work. United States Congressman A wanted to know when the money would be released for the grant. Deputy Governor B agreed to look into the matter.

Eventually, Deputy Governor B talked to the Governor's budget director about the grant and was told that the hold up was in the governor's office.

After the construction started on the AUSL project, Deputy Governor B had a conversation with Blagojevich about the grant. Deputy Governor B told Blagojevich about his conversations with United States Congressman A and that United States Congressman A was upset about the funding not being released. Blagojevich then said words to the effect of, "where is my fundraiser and tell [United States Congressman A] to have his brother have a fundraiser." Deputy Governor B understood that Blagojevich wanted United States Congressman A's brother to have a fundraiser if United States Congressman A wanted the grant money and wanted a message delivered to United States Congressman A about a fundraiser. It was also Deputy Governor B's understanding that Blagojevich did not want to release the money until United States Congressman A's brother held a fundraiser for him. Deputy Governor B was extremely concerned about Blagojevich's statements and thought that what Blagojevich was asking was illegal. Deputy Governor B chose not to pass the message on to United States Congressman A or his brother.

Not long after Deputy Governor B's conversation with Blagojevich, Deputy Governor B contacted Lobbyist A. Deputy Governor B told Lobbyist A that Deputy Governor B had a conversation with Blagojevich about the grant money, what Blagojevich wanted done, and that Deputy Governor B thought what Blagojevich was proposing was both stupid and illegal.

Around this same time frame, Lobbyist A had conversations with Blagojevich, during which Blagojevich asked Lobbyist A to approach United States Congressman A for a fundraiser. At some point, Blagojevich also mentioned to Lobbyist A that Blagojevich was giving a substantial grant to a school in United States Congressman A's congressional district. Lobbyist A was concerned that Blagojevich was connecting the grant for the school with a fundraiser. Lobbyist A did not reach out to United States Congressman A to request a fundraiser.

At the same time, and after he joined the Office of the Governor, John Harris learned that Blagojevich had agreed to give a one to two million dollar grant to a charter school in United States Congressman A's congressional district. Harris understood that some portion of the grant was hung up by Blagojevich. Deputy Governor B talked to Harris about trying to get the grant money released. Harris went to Blagojevich about releasing the grant funds. Blagojevich told Harris to hold up the grant money and not to release it without checking with him. Blagojevich did not tell Harris why Blagojevich wanted the grant money held up, but Harris believed that Blagojevich was playing games with the grant.

Harris ultimately learned that AUSL had incurred expenses in reliance on the forthcoming grant money. Harris went to Blagojevich and told Blagojevich that certain costs had already been incurred in reliance on the grant. Harris suggested that money be paid for expenses incurred by AUSL. Blagojevich resisted this idea, but ultimately Harris persuaded Blagojevich to release some

of the grant money. Blagojevich told Harris that Blagojevich wanted to know how much Harris was going to release.

Harris instituted a process for payment of the grant money that required that AUSL submit receipts for work done, and based on those receipts, Harris would authorize the release of funds to cover the expenses incurred. Harris advised Blagojevich with respect to the release of this grant money.

Ultimately, because of Blagojevich holding up the grant money and refusing to pay the money in a lump sum, the State of Illinois had to produce five separate grant agreements for different sums to AUSL. Each grant was largely based on the amount of expenses that AUSL had incurred in relation to the project. Each time a different set of grant documents was produced, additional monies were released. The release of the money occurred over approximately three months and finally resulted in AUSL obtaining nearly $2 million.

### 2. Attempted Extortion Relating to the Tollway Program

In about the summer of 2008, board members with the Illinois Toll Highway Authority (the "Tollway") talked with Blagojevich and senior members of his administration about potential plans to fund road building programs through the Tollway. There were different options depending on how much money was to be spent: one option was expected to cost about $1.8 billion and a second, more expansive program was expected to cost about $5 billion. Blagojevich, as the Governor, had the power to authorize either plan without requiring the approval of the Illinois legislature.

Blagojevich subsequently told Monk, who at that point was a lobbyist and a significant fundraiser for Blagojevich, about both the $1.8 billion plan and the $5 billion plan. Blagojevich indicated to Monk that he was going to announce the $1.8 billion program that Fall and that he

would go forward with the $5 billion plan the following year. As Blagojevich knew, Monk was the point of contact for Friends of Blagojevich ("FOB") with a number of engineering firms. Blagojevich talked with Monk about how good the Tollway road building project would be for engineering companies. Blagojevich then talked about the pending ethics legislation that would prevent Blagojevich from raising money from engineering firms that did business with the state after the end of the year. Blagojevich told Monk to reach out to the engineering firms and tell them to step up and donate and that they would no longer have to donate after January 1, 2009. Blagojevich said something to the effect of, "If they don't step up, fuck 'em. I won't do the bigger announcement in January." Monk understood that Blagojevich was trying to put some pressure on Monk to get the firms that he dealt with for fundraising to contribute to Blagojevich.

In about mid-September 2008, Blagojevich met with Monk, Robert Blagojevich, and Construction Executive, who was an executive in a cement company, at the FOB offices. As an active member of a concrete industry association group, Construction Executive had been responsible for raising large amounts of contributions for Blagojevich beginning in about 2002. Monk had become the primary contact with Construction Executive in terms of fundraising for Blagojevich in about 2007. At the meeting, Blagojevich also talked about both the potential $1.8 billion and $5 billion Tollway road building programs. Blagojevich indicated to Construction Executive that he was going to announce the small plan that Fall. Blagojevich said that he was inclined to also go forward with the larger plan, but that he did not want word to get out about his interest in doing so. Blagojevich explained that he wanted to keep that quiet so that the legislature would continue to feel pressure to pass a capital bill. Blagojevich suggested to Construction Executive that Blagojevich had the power to go forward with either of the two Tollway roadbuilding

programs without the approval of the legislature. In response, Construction Executive told Blagojevich that he was in favor of the building programs because the concrete industry really needed the work.

Shortly thereafter in the meeting, Blagojevich said he wanted to talk about campaign contributions. Blagojevich talked about the change in Illinois law that would restrict the ability of companies that did work with the State of Illinois to contribute money to him, and how that law would take effect by the end of the year. Blagojevich asked for Construction Executive's help raising money and indicated that Blagojevich wanted to raise the money before the end of the year. Blagojevich asked Construction Executive how much money he could raise. When Construction Executive initially indicated that he did not know, Blagojevich again brought up the Tollway program and discussed additional projects that could be done if the larger program were done. At the end of the meeting, Construction Executive was again asked about how much money he thought he could raise for Blagojevich. Construction Executive indicated that he would have to go back to his people and talk to them about it.

Both Monk and Construction Executive understood that Blagojevich was making a connection in the meeting between the amount of money that Construction Executive might be able to raise for Blagojevich and his willingness to do the larger Tollway program. As a result of Blagojevich's statements, Construction Executive felt pressure from Blagojevich to raise money for Blagojevich so that he would allow the larger Tollway program to go forward.

After Construction Executive left the meeting, Blagojevich directed Monk to ask Construction Executive to raise $500,000 in contributions, which money Monk understood would

come both from Construction Executive's own company as well as from other companies in the road building industry.

On October 6, 2008, Blagojevich met with Lobbyist A at the offices of Friends of Blagojevich ("FOB") offices. During their meeting, Blagojevich mentioned an upcoming announcement he was planning to make regarding a $1.8 billion project with respect to the Tollway. Blagojevich said words to the effect of, "I've got Lon going to Construction Executive and asking for $500,000" and "I could have made a larger announcement but wanted to see how they perform by the end of the year. If they don't perform, fuck 'em." Lobbyist A knew that Construction Executive was involved with a trade association that would benefit from the proposed $1.8 billion project. Lobbyist A understood Blagojevich to mean was that he expected that Construction Executive would raise $500,000 in contributions to FOB and that Blagojevich was willing to commit additional state money to the project beyond the $1.8 billion but was waiting to see how much money interested entities raised for FOB before the end of the year.

In mid-October 2008, Blagojevich announced a plan for a $1.8 billion Tollway building program. On about October 22, 2008, Blagojevich called Construction Executive. Blagojevich talked about the $1.8 billion program and asked Construction Executive something like "How are you coming with the fund raising?" Construction Executive indicated to Blagojevich that he was working on raising money, but that was not true. Construction Executive did not, in fact, plan on raising any money for Blagojevich, but Construction Executive did not want to say that for fear that Blagojevich would be less inclined to go forward with the larger Tollway project. Construction Executive ultimately did not make or arrange for any contributions to be made to Blagojevich.

55

Monk also continued to stay in touch with Construction Executive about potential contributions to Blagojevich, and consistently reported on the status of those conversations to Blagojevich and Robert Blagojevich, including on November 24, 2008 (Blagojevich Call #1005).[22]

3.      Attempted Extortion of Children's Memorial Hospital

Children's Memorial Hospital ("Children's Memorial") is primarily dedicated to providing health care for children and is the largest provider of specialty pediatric services in the State of Illinois. The pediatric specialists who provide care at Children's Memorial receive reimbursement for some of that care from the Illinois Medicaid program. Under the state Medicaid program, the State of Illinois pays practice groups that employ pediatric doctors who provide medical care at Children's Memorial a set amount for different physician services.

For a number of years up to and including 2008, the Medicaid rates that the State of Illinois paid for pediatric physician services was low compared to how much the services actually cost to provide. As a result, many pediatric specialists in the State of Illinois, including the specialists who provided care at Children's Memorial, had been losing money by providing care to Medicaid patients. While Children's Memorial provided health care to children regardless of whether the child could pay, some pediatric specialists limited the number of Medicaid patients that they treated or refused to treat Medicaid patients because of the money they were losing. This was a significant

---

[22] Beginning in late October 2008 and extending through December 9, 2008, the government intercepted conversations pursuant to court-authorized wiretaps on phones used by Blagojevich, Robert Blagojevich, and others. The government will refer to calls intercepted over those wiretaps as "Blagojevich Call #__" for purposes of this motion.

concern to Children's Memorial, as it meant that children across the state were having a difficult time finding pediatric specialists who would take care of them. Further, the money that pediatric specialists who provided services at Children's Memorial lost from serving Medicaid patients was significant – about $20 million in 2007.

As a result, Children's Memorial, along with other major pediatric care providers in the State of Illinois, has been trying for years to convince state policy makers to raise the Medicaid reimbursement rates for pediatric specialists. As part of those efforts, senior executives from Children's Memorial met with State of Illinois staffers in the summer of 2008 to argue in favor of increasing the Medicaid reimbursement rates for pediatric specialists, which could be done by the Governor without any need for legislative approval.

The President and CEO of Children's Memorial ("Children's CEO"), made efforts to speak with Blagojevich personally in about August 2008 about increasing the Medicaid reimbursement rates, but was unsuccessful. However, after Children's Memorial arranged for the manager of a baseball team to contact Blagojevich on the mater, Blagojevich arranged to talk with Children's CEO on or about September 23, 2008. In that conversation, Blagojevich said he wanted to help, and asked Children's CEO to send him some background information about Children Memorial's proposal.

In either late September or early to mid October 2008, Blagojevich spoke by phone with Deputy Governor A, who was responsible for health policy matters, about the proposed rate increase. Blagojevich said that he heard Children's Memorial was interested in a rate increase and asked if it made sense to do something like that. Deputy Governor A said that they had to consider the budget constraints, but it would fit with their overall policy. Deputy Governor A told

Blagojevich that the rate increase would cost approximately $8 million to $10 million. Blagojevich stated that Deputy Governor A should look into doing the rate increase for Children's Memorial, which Deputy Governor A understood to mean that Deputy Governor A should be prepared to get the rate increases done. As a result, Deputy Governor A contacted the head of the responsible state agency and directed the agency head to move forward with the rate increase proposal, which they expected would take effect on January 1, 2009.

On October 8, 2008, Blagojevich met with Lobbyist A, who was a lobbyist for Children's Memorial, Robert Blagojevich, and Monk at the FOB Offices. At one point in the meeting, during a discussion of Children's Memorial, Blagojevich said to Lobbyist A words to the effect of, "[the baseball manager] called me. I'm going to do $8 million for them, I want to get [Children's CEO] for 50." Lobbyist A understood Blagojevich to be making a reference to the efforts of Children's Memorial to increase the pay for its physicians and to be saying that Blagojevich wanted to approach Children's CEO for a $50,000 contribution to FOB. In response, Lobbyist A said that Children's Memorial was a non-profit organization, $50,000 was a very hard number, and now was not the time. Lobbyist A thought that it would be appropriate to wait for a year or more to solicit any contribution, and that it would be wrong to ask Children's Memorial for money while they were awaiting funding for their doctors. Lobbyist A suggested giving Children's CEO more time before soliciting any donation. In response, Blagojevich said words to the effect, "how much time do you mean, ten days?"

Either later that day after Lobbyist A left or at another meeting between Blagojevich, Robert Blagojevich, and Monk, the topic of getting a contribution from Children's Memorial was raised again. Blagojevich asked Monk to seek a contribution from Children's Memorial. Monk said that

58

it did not make any sense for him to do that because he did not have any contacts at the hospital, and eventually it was decided that Robert Blagojevich would follow up.

On October 9, 2008, Robert Blagojevich left a voicemail for Lobbyist A in which Robert Blagojevich indicated that he was "just kind of trying to clean up ah, loose ends from yesterday" and that "I know that you're gonna be following up with Children's Memorial and just wanted to know what the next steps are and what it is, kind of we're looking to accomplish there."  Robert Blagojevich indicated that he wanted to " make sure I'm following up on you so you get it done." and that "you know I'm jerking your chain but ah, I ah, I think they have a potential to do well by us."

On or about October 17, 2008, Children's CEO called Blagojevich after receiving a message that Blagojevich wanted to speak with him.  In that conversation, Blagojevich said he was supportive and that he had approved a $10 million increase in the Medicaid payments that would be made to pediatric doctors.  Blagojevich told Children's CEO that the increase in payments would take effect on January 1, 2009, and asked Children's CEO to work with Blagojevich's staff prior to that date. Blagojevich asked Children's CEO to keep this quiet until the end of the year, which Children's CEO understood to mean that he should not draw attention to the increase.  Children's CEO was very pleased to hear what Blagojevich said, and thought that it was quite significant that it was the governor himself, as opposed to someone on his staff, who was indicating that the increase would happen.

On or about October 22, 2008, Lobbyist A met again with Blagojevich and Robert Blagojevich at the FOB office.  During that meeting, Blagojevich informed Lobbyist A that Blagojevich had called Children's CEO and told Children's CEO that he was moving forward with

the money that Children's Memorial had wanted. Blagojevich said that he did not want to directly ask Children's CEO for money because he wanted to maintain a line between government and fundraising. Blagojevich then asked whether Lobbyist A or Robert Blagojevich should be the person to ask Children's CEO for the money. Lobbyist A understood that Blagojevich was, in effect saying that Children's Memorial had gotten the money they wanted and, therefore, were going to be asked to make a contribution to FOB. Robert Blagojevich agreed to make the call to Children's CEO to ask for the money.

On or about October 22, 2008, Children's CEO got a message that he should call Robert Blagojevich. Children's CEO had met Robert Blagojevich many months earlier at a fundraising event and shook hands with him, but otherwise had not spoken with him. When Children's CEO returned the call, Robert Blagojevich said that he wanted Children's CEO to arrange a fund raising event for Blagojevich. Robert Blagojevich said words to the effect that "we would like for you to raise $25,000 for the governor." Robert Blagojevich was not specific about how Children's CEO could arrange to raise the money, but suggested that Children's CEO, his friends and associates, and Children's Memorial board members could make contributions. In response, Children's CEO said that he knew that Blagojevich supported Children's Memorial and many of the issues that were important to the hospital and that Children's Memorial would like to be helpful, but did not know how they could. Children's CEO had no intention of raising funds for Blagojevich, but was afraid that if he said no directly Blagojevich might rescind his commitment to increase the pediatric Medicaid rates. Robert Blagojevich pressed Children's CEO on arranging the contribution, saying that a contribution would be most helpful if it were delivered by the end of the year.

Children's CEO was upset after the call because of the pressure from Robert Blagojevich to arrange a contribution of $25,000 to Blagojevich. As a result, Children's CEO decided that he would not talk any further with Robert Blagojevich, and instructed his staff not to forward him any calls from Robert Blagojevich. Robert Blagojevich made several more attempts to call Children's CEO after October 22, 2008, but Children's CEO did not answer or return those calls.

On November 12, 2008, at approximately 8:43 a.m., Blagojevich was intercepted speaking with Robert Blagojevich (Blagojevich Call #836). In that call, Robert Blagojevich said that he had never heard back from Children's CEO even though he had left three messages for Children's CEO. Blagojevich indicated that he would call Children's CEO.

On November 12, 2008, at approximately 2:14 p.m., Blagojevich was intercepted speaking with Deputy Governor A (Blagojevich Call #572). The call started with Blagojevich asking about the pediatric doctors reimbursement, which Deputy Governor A understood to be a reference to the Children's Memorial reimbursement issue. Deputy Governor A was not expecting the reimbursement issue to come up in this conversation. Blagojevich asked Deputy Governor A if it had happened or was still on hold. Deputy Governor A responded that it was set for January 1st. Blagojevich asked Deputy Governor A if they had discretion over the rate increase and Deputy Governor A confirmed that they did. Blagojevich then asked Deputy Governor A if they could "pull it back if we needed to — budgetary concerns — right?" Deputy Governor A told Blagojevich that they could pull it back. Blagojevich stated that was "good to know."

Based on Blagojevich's statements, Deputy Governor A understood that Blagojevich either wanted the rate increase put on hold or killed. Deputy Governor A did not believe that Blagojevich wanted to hold or kill the rate increase for budgetary reasons. Blagojevich had never before cited

to Deputy Governor A budgetary concerns as a reason to not do something and the amount of money being discussed for the rate increase was not nearly as significant as a number of other budget issues that were being addressed. Further, Deputy Governor A had not talked to Blagojevich about the rate increase being a budget problem and, in fact, the proposed rate increases would not affect the budget because they were not to be paid for with new money. Deputy Governor A understood that if he let the rate increase go through, Blagojevich would have been very angry. After the phone call with Blagojevich, Deputy Governor A called the agency head and told him to put a hold on the rate increase. In turn, the agency head directed his staff to stop working on the rate increase.

In the Fall of 2008, Monk was at a meeting with Blagojevich and Robert Blagojevich. In that meeting, Blagojevich asked Robert Blagojevich about getting a contribution from Children's Memorial. Robert Blagojevich said the contact at Children's Memorial had not returned a number of his calls and he was not going to call him anymore. Blagojevich got upset and said words to the effect, "Screw these guys" or "Screw them." Almost immediately, Blagojevich arranged for a phone call to Deputy Governor A about some funding that the State of Illinois was about to give to Children's Memorial. While Monk did not participate in the phone conversation or hear Deputy Governor A's statements, he heard Blagojevich said words to the effect, "Where are we on the money to Children's Memorial Hospital?" There was a pause, then Blagojevich said words to the effect, "Hold it up" or "Slow it down" or "Don't do anything until I tell you." Monk understood that Blagojevich was instructing Deputy Governor A to hold up the money that was supposed to go to Children's Memorial.

As of the date of Blagojevich's arrest on December 9, 2008, he had not directed that any work on the Medicaid rate increase resume or go forward, and no further work had been done.

4.     Attempted Extortion of Racetrack Executive

In about May 2006, Illinois House of Representatives Bill 1918 was passed, which established a subsidy for the Illinois horse-racing industry from the revenues of the Illinois casino industry. Under the bill, a percentage of the money that the top four casinos collected was distributed to the horse-racing industry. The bill provided, however, that the subsidy would only be collected for two years, so it ended in about May 2008. Racetrack Executive, who was a part owner and an executive of two different horse-racing tracks that benefitted from Bill 1918, was involved in lobbying in support of the bill.

Before Bill 1918 expired, Racetrack Executive talked with Monk about the bill. Racetrack Executive had arranged to hire Monk as a lobbyist for his racetrack companies in 2007. Monk knew that Racetrack Executive wanted to get legislation passed that would extend the life of the bill.

In November 2008, the Illinois legislature met in a session that lasted for two weeks. During that session, the Illinois legislature considered a bill that would extend the casino subsidy of the horse-racing industry for another three years (the "Racetrack Bill"). Prior to the November 2008 legislative session, Monk attended a meeting to talk about fundraising with Blagojevich and Robert Blagojevich at the FOB offices. As part of the fundraising meeting, Blagojevich called Racetrack Executive, who historically had been a significant contributor to Blagojevich. After the call, Monk agreed to follow up with Racetrack Executive to try to collect a contribution.

After that meeting, Monk had a number of conversations with Racetrack Executive about a potential contribution that he might arrange to make to Blagojevich. In those conversations, Racetrack Executive did not commit to making a contribution, but Monk believed that he would ultimately make one. Monk reported to Blagojevich and Robert Blagojevich about Monk's

conversations with Racetrack Executive about raising money. Monk wanted to get the contribution made before the Racetrack Bill passed because he was concerned about the perception that Racetrack Executive's contribution was designed to get Blagojevich to sign the bill, and he discussed his concerns about the timing of the contribution with Robert Blagojevich and Blagojevich.

On November 20, 2008, the Illinois legislature passed the Racetrack Bill, which extended the subsidy from the casino industry to the horse-racing industry for another three years. On around November 24, 2008, the Racetrack Bill was sent to Blagojevich's office, which meant that Blagojevich could sign the bill and make it law.

Once the Racetrack Bill passed, Racetrack Executive began to urge Monk to try to get Blagojevich to sign the Racetrack Bill as soon as possible. Racetrack Executive told Monk that his race tracks were losing about $9,000 for each day that the bill was not signed into law. As a result, Monk began to push Blagojevich to sign the Racetrack Bill.

Monk also spoke with John Harris, who was then Blagojevich's Chief of Staff, about the Racetrack Bill. After talking with Monk, Harris learned from his staff that the Governor's Office staff had reviewed the Racetrack Bill and approved it, so the only remaining step was for Blagojevich to sign the bill. Harris understood that Blagojevich supported the bill. Harris told Blagojevich that the Racetrack Bill was ready to be signed, but Blagojevich told Harris to hold the bill. Blagojevich did not provide any reason why Harris should hold the bill.

On December 3, 2008, Monk went to the FOB offices for a meeting with Blagojevich and Robert Blagojevich about fundraising. When Monk arrived, Blagojevich indicated that he wanted to talk with Monk alone, so Blagojevich and Monk went to Blagojevich's office alone. Blagojevich

64

talked to Monk about Racetrack Executive and the Racetrack Bill. Monk raised a concern that Racetrack Executive would not make any contribution once Blagojevich signed the Racetrack Bill. Blagojevich suggested that Monk could tell Racetrack Executive that Blagojevich would sign the Racetrack Bill, with other pending bills, after the first of the year. Blagojevich then called a member of his staff and confirmed that there were approximately 30 bills waiting for his signature and that Blagojevich could have signed them all that day. Blagojevich instructed the staffer to hold all the bills, as Blagojevich would do them all together. Blagojevich then told Monk to "get it done," which Monk understood was an instruction to get Racetrack Executive to make the contribution. After Monk indicated that he would go see Racetrack Executive immediately, Blagojevich asked Monk what he would say. Monk indicated that he would say "stop screwing around, get me the money" and that "the concern is, is that, um he's holding back and wants to group all these bills together, but what's affecting him is that he feels like you're gonna get skittish if he signs the bill." Blagojevich agreed with Monk's proposed language, and suggested that Monk indicate that Blagojevich would like a week's separation between the contribution and the signing of the bill. Monk recognized that telling Racetrack Executive that the Racetrack Bill would not be signed until a week after a contribution was made would put pressure on Racetrack Executive to make the contribution sooner, and Monk understood from Blagojevich's statements that Blagojevich was going to delay signing the Racetrack Bill to put pressure on Racetrack Executive to contribute to FOB.

Monk then drove to meet with Racetrack Executive at one of his racetracks. There, Monk told Racetrack Executive that he had talked with Blagojevich and that Blagojevich was concerned that Racetrack Executive would be "skittish" about making a donation if Blagojevich signed the bill.

Monk did indicate to Racetrack Executive that the fundraising and the signing of the Racetrack Bill were two different subjects, but Monk knew that they were not because Blagojevich had tied the two together.

In response, Racetrack Executive said words to the effect of "I knew it. I knew it was something like that." Racetrack Executive talked about the possibility of making part of his donation after the end of the year, but Monk pushed him to make the entire donation before the end of the year. Racetrack Executive said he was going to leave town in a few weeks, but suggested that he would get the contribution done before he left town. Racetrack Executive understood that Monk was suggesting that Blagojevich was concerned that if he signed the bill, then Racetrack Executive would not have any incentive to make the contribution and would not make it. Racetrack Executive also did not believe Monk when he indicated that the contribution and the bill signing were two separate matters. Monk asked if Racetrack Executive could make a contribution before the end of the year. Racetrack Executive felt pressure to make a contribution, but did not directly refuse the request because Blagojevich had not yet signed the Racetrack Bill.

After Monk left Racetrack Executive's office, he called Blagojevich (Blagojevich Call #459) and described to Blagojevich his conversation with Racetrack Executive. On the morning of December 4, 2008, Monk spoke again with Blagojevich (Blagojevich Call #512). In that call, Monk suggested that Blagojevich call Racetrack Executive directly, in part because Racetrack Executive would feel more pressure to make the donation if Blagojevich called him directly. Blagojevich suggested that he would tell Racetrack Executive that Blagojevich would do an event downstate to sign the bill, which Monk recognized would put more pressure on Racetrack Executive to contribute, as it would take time to schedule such an event and show that Blagojevich was not going to sign the

66

bill immediately. Neither Monk nor Blagojevich had any further conversations with Racetrack Executive prior to the December 9, 2008 arrest of Blagojevich.

### D. Blagojevich 2008 Attempt To Force Tribune Company to Fire Chicago Tribune Editorial Board Members Through Threatened State Action

Throughout 2008, members of Blagojevich's staff, including Harris, Individual I, and Deputy Governor A, were involved in discussions related to possible State of Illinois involvement in the sale of Wrigley Field by the Tribune Company. Initially, the discussions centered around the involvement of Illinois Sports Facility Authority ("ISFA") in such a deal. The ISFA had been created by an earlier state administration as a vehicle to encourage the Chicago White Sox to stay in Chicago when it appeared that the team might move out of Illinois. Blagojevich wanted a similar deal in which the Chicago Cubs would enter into a long term lease with the ISFA, ensuring that the Cubs would stay in Illinois, and the ISFA would own the field and undertake major restorations on Wrigley Field. Ultimately, this plan was unsuccessful and the ISFA was not used for the transaction.

Blagojevich's staff then focused on using the Illinois Finance Authority ("IFA") to fund the project. One reason this was an attractive solution to Blagojevich's staff was that the ISFA approach required approval from the State legislature, while the IFA could perform the transaction without legislative approval. Discussions related to the IFA's involvement in the sale of Wrigley were ongoing through the latter half of 2008.

At the same time, Blagojevich became increasingly upset by what he viewed as the Chicago Tribune's negative editorial pieces regarding his administration. It was his belief that the Tribune's negative coverage of him was fueling certain adversaries of his in the State legislature and that the combination was feeding the possibility of his impeachment. At the suggestion of his wife, Blagojevich discussed with Deputy Governor A and ultimately directed Harris to threaten Individual

67

J, who was both the owner of the Tribune and the Cubs, that the IFA would not be able to participate in the sale of Wrigley unless certain members of the Tribune's editorial board were fired. Blagojevich had a series of conversations about this with his wife, Deputy Governor A, Harris, Advisor B and others.

On the evening of November 3, 2008, Blagojevich talked to Deputy Governor A (Blagojevich Call #162). Blagojevich stated that he was concerned about possibly being impeached in the Spring and that the Chicago Tribune would be "driving" the impeachment discussion. Blagojevich asked Deputy Governor A to check to see if the Tribune had recently advocated that he be impeached. In fact, the Chicago Tribune recently had published editorials critical of Blagojevich.

Later on November 3 (Blagojevich Call #163), Deputy Governor A reported to Blagojevich the results of the research he had done personally into Tribune articles discussing impeachment of Blagojevich. Deputy Governor A discussed an editorial from the Chicago Tribune regarding the endorsement of Illinois House legislative leader and calling for a committee to consider impeaching. At one point during the phone call, Blagojevich told Deputy Governor A to tell Blagojevich's wife about what the articles said. Deputy Governor A gave Blagojevich's wife some of the information he had also told Blagojevich. In response to what the Tribune had written, Blagojevich's wife suggested holding up the Cubs deal, which Deputy Governor A understood to be the proposed Tribune deal at the IFA. Blagojevich then got back on the phone and directed Deputy Governor A to put together the articles in the Tribune that were on the topic of removing Blagojevich from office. Blagojevich said that he would have Harris go to Individual J and tell him (in certain terms) to fire the editorial board members or they won't be able to have the IFA involved in the Wrigley

sale.

On November 4, 2008 (Blagojevich Call #193), Blagojevich directed Harris to tell Tribune Company representatives that the Wrigley Field project would no longer move forward unless the Tribune fired people on the editorial board. Harris agreed to do so, although he never had any intention of doing so.

On November 5, 2008 (Blagojevich Call #282), Blagojevich again raised this topic with Harris. Advisor B and another staffer were also on the phone when he did so. Blagojevich directed Harris to tell one of Individual J's executives, Individual K, that, "everything is lined up, but before we go to the next level we need to have a discussion about what you guys are going to do about that newspaper." Harris stated that he "won't be so direct." Blagojevich told Harris "yeah, you know what you got to say."

On November 6, 2008 (Blagojevich Calls #317 and 319), Harris told Blagojevich that he had spoken to Individual K. Harris said that he had told Individual K that the deal would not happen without changes at the editorial board. In fact, Harris had not told this to Individual K but knew that this was what Blagojevich had wanted him to say to Individual K. During this call, Blagojevich told Harris that he needed to tell Individual K that "we" (meaning the Office of the Governor) want editorial support. Blagojevich asked Harris what the IFA deal meant to the Tribune in monetary terms. Blagojevich was under the mistaken impression that it was worth $500 million to the Tribune. Harris tried to explain to Blagojevich that it was closer to less than $100 million. Although he did not agree with Harris, Blagojevich said that $100 million was nothing to sneeze at and that it had to be worth something to the Tribune. Harris understood that what Blagojevich was saying was that he wanted Individual J to believe that Blagojevich was willing to pull state support

on the Wrigley deal, which Blagojevich believed Individual J significantly valued, if Individual J did not get the Tribune to stop running negative editorials about Blagojevich.

On November 11, 2008 (Blagojevich Call #500), Harris relayed to Blagojevich a meeting he had with Individual K the previous day. Harris told Blagojevich that Individual J understood the message and was sensitive to the issues. In fact, despite Blagojevich's directive to him, Harris did not convey to Individual K Blagojevich's request to remove editorial board members, nor did Harris give the impression that this was a "do it or else" situation. Individual K did tell Harris that certain layoffs were imminent. As such, Harris told Blagojevich to expect results on the editorial board adjustments before the end of the month. Harris implied to Blagojevich that the Tribune people understood his time line, which made Blagojevich feel that the Tribune was being sensitive to his issues. In reality, the Tribune already had a time line in place for staff reduction that was unrelated to Blagojevich's request to make changes on the editorial board. Because Blagojevich believed that Harris had followed through on his directive to threaten Individual J, Blagojevich was happy with Harris because he thought action would follow. Blagojevich expressed disappointment when the editorial board was later unaffected by the cutbacks.

On November 20, 2008 (Blagojevich Call #856), Blagojevich asked Harris if he had made any progress on the Tribune editorial board and Individual K. Harris knew this was a reference to Blagojevich's directive to him that he should relay the threat to Individual J that if the Tribune didn't do something about the editorial board, then Blagojevich would pull the state funding for the Cubs deal. Blagojevich was upset because the Tribune Editorial Board had mocked Deputy Governor A and hung up on him. Harris tried to focus on a good Tribune editorial regarding the Tollway, but

Blagojevich did not care. Blagojevich wanted people to be fired from the Tribune editorial board and wanted to use Harris to get to Individual K.

On November 21, 2008 (Blagojevich Call #894), Blagojevich told Harris that Deputy Governor A was upset with the Tribune and Blagojevich wanted Harris to follow up on the matter. Blagojevich tried to clarify with Harris that the Tribune team understood that if they kept up the negative editorials, the deal would fall apart. On November 21, 2008 (Blagojevich Call #895), Blagojevich called Harris to stay on top of the Tribune matter.

### E.  Blagojevich Efforts To Obtain Personal Financial Benefits and Campaign Contributions In Exchange For Appointment of United States Senator

Rod Blagojevich sought to obtain financial benefits for himself and his wife in return for the exercise of his duty under Illinois law to appoint a United States Senator to fill the vacancy created by the election of Barack Obama as President of the United States. In this regard, Blagojevich worked with and had the assistance of, among others, his wife, Robert Blagojevich, John Harris, Deputy Governor A, Advisor B, and Individual I.

In summary, shortly before the presidential election Rod Blagojevich came to believe that Barack Obama was interested in having Senate Candidate B named to the vacant Senate seat should Obama win the presidential election. Thereafter, and until around the time Senate Candidate B removed her name from consideration for the Senate seat on approximately November 12, 2010, Blagojevich conspired to name Senate Candidate B to the Senate seat in exchange for a variety of benefits to himself or his family, including high-ranking and salaried jobs in federal government, well-paying jobs at private foundations, a well-paying leadership position with a labor organization known as Change to Win, corporate board positions, and a well-paying job that would be available

to him after he left the governorship at a newly created not-for-profit organization funded with millions of dollars in contributions by persons associated with the President-elect.

To implement his plans, Blagojevich had several advisors, including Harris and Deputy Governor A, research jobs that he wanted made available to him and the amount of money those jobs paid. In addition, to implement his plans, Blagojevich specifically asked those he believed to be representing Obama for the position of Secretary of Health and Human Services ("HHS") in exchange for naming Senate Candidate B to the Senate seat. Later, when it became clear that Blagojevich would not receive the Secretary of HHS position in exchange for naming Senate Candidate B, Blagojevich asked those he believed to be representing Obama for millions of dollars in funding for a not-for-profit organization, where Blagojevich could later obtain a well-paying job, in exchange for naming Senate Candidate B to the Senate seat.

After Senate Candidate B removed her name from consideration for the Senate seat, Blagojevich's plans to obtain a personal benefit for the Senate seat were stifled by the fact that nobody appeared willing to pay Blagojevich for the Senate seat. During this time frame, Blagojevich engaged in a number of conversations with a variety of individuals regarding what to do with the Senate seat. Certain of these conversations continued to consider options in which Blagojevich would improperly personally profit from the Senate seat, while other conversations considered legitimate options related to filling the Senate seat.

Ultimately, Blagojevich made at least one additional effort to obtain a personal benefit in exchange for the Senate seat. Specifically, in late October 2008, Blagojevich received what he believed to be an offer of $1.5 million in campaign contributions from representatives of Senate Candidate A in return for Blagojevich's appointment of Senate Candidate A to the Senate seat. On

December 4, 2008, Blagojevich instructed Robert Blagojevich to contact a representative of Senate Candidate A and advise the representative that if Senate Candidate A was going to be named to the Senate seat then some of the promised fundraising needed to start occurring immediately. Robert Blagojevich then set up the meeting. The following day, Blagojevich told Robert Blagojevich to cancel the meeting with the representative of Senate Candidate A after Blagojevich learned of the publication of a Chicago Tribune article that suggested Blagojevich had been surreptitiously recorded in connection with an ongoing federal investigation.

Starting in approximately Summer 2008, Blagojevich talked to Harris about the fact that Blagojevich was concerned about Blagojevich's life after he was governor. Blagojevich expressed concern that he was not very employable. As time progressed and it became clearer that Blagojevich would have the opportunity to name a senator, Blagojevich repeatedly expressed an interest in personally profiting through naming a replacement senator. Despite repeated warnings from others that he could not personally profit in any way, Blagojevich continued to suggest methods in which he could personally profit from the naming of a senator.

As the presidential election grew closer, Harris, Deputy Governor A, and others discussed with Blagojevich setting up a formal process to consider candidates to fill the senate seat. Although Blagojevich publicly stated he had instituted a formal process to fill the senate seat, he never did so.

On approximately November 3, 2008 (Blagojevich Call #117), Harris told Blagojevich that Harris had been informed that Barack Obama very much cared about Senate Candidate B and thought Senate Candidate B would make a good senator. Almost immediately after hearing that Barack Obama thought Senate Candidate B would make a good senator, Blagojevich indicated he was interested in getting a position as the Secretary of HHS in exchange for naming Senate

Candidate B as senator. Blagojevich told Harris to research who else had been Secretary of HHS. Blagojevich also indicated he wanted to leak to the press that he was considering Individual L as a senate option. Although Blagojevich was not seriously considering Individual L as a senate option, Blagojevich believed that if those interested in having Senate Candidate B named senator believed that Blagojevich was, in fact, seriously considering Individual L, then Blagojevich would have greater leverage to obtain personal benefit in exchange for naming Senate Candidate B as the senator.

Later on November 3, 2008 (Blagojevich Call #149), Blagojevich talked to Harris again. During the call, Blagojevich stated his belief that individuals associated with Service Employees International Union ("SEIU") were coming to meet with Blagojevich that day to push for Senate Candidate B's appointment. During this same conversation, Blagojevich asked when Harris was going to talk to Individual M. Blagojoevich repeatedly referred to Harris's conversation with Individual M as the "off campus discussion." These conversations were follow-ups to conversations Blagojevich had with Harris earlier in the summer in which Blagojevich directed Harris to ask Individual M for Individual M's campaign fund money in exchange for naming Individual M to the U.S. Senate Seat. Blagojevich believed that Individual M would provide campaign fund money to Blagojevich because Individual M could not use the money in a federal election since the rules are different for Illinois state elections and federal elections.

During this same time period, Blagojevich had several conversations with his wife in which they discussed job options in addition to Secretary of HHS, such as ambassadorships, that Blagojevich might be able to get if he named Senate Candidate B to the Senate seat. Blagojevich expressed significant interest in what these positions paid. Blagojevich specifically tasked Deputy

74

Governor A with looking into ambassadorships that Blagojevich might be able to obtain in exchange for naming Senate Candidate B to the senate seat.

On the afternoon of November 3, 2008, Blagojevich met with Labor Union Official and another representative of SEIU. During the meeting, there was a discussion about a number of different candidates for the Senate seat. Both SEIU representatives expressed their view that Senate Candidate B would be a good choice for the Senate seat. Blagojevich stated that he assumed that if Obama was interested in Senate Candidate B being named to replace Obama, then Obama would be in touch with Blagojevich.

On November 4, 2008 (Blagojevich Call #218), Blagojevich talked to Deputy Governor A. Blagojevich complained that Advisor B, a former staffer who continued to advise Blagojevich, had informed Blagojevich that Blagojevich should not take the Senate seat himself. Blagojevich complained to Deputy Governor A that Blagojevich's "upward trajectory" was stalled because of Obama's election. Blagojevich told Deputy Governor A that Blagojevich had made "decisions at the expense of [his] family's best interests for . . . [his] job as governor." Blagojevich informed Deputy Governor A "now is the time for me to put my fucking children and my wife first, for a change."

On November 5, 2008 (Blagojevich Call #255), Blagojevich informed Deputy Governor A that Labor Union Official, who was one of the officials who had met with Blagojevich on November 3, 2008 to discuss the Senate seat, was coming back to meet with Blagojevich to discuss the Senate seat. Labor Union Official was set to meet with Blagojevich the following day. Blagojevich talked through jobs he could request in exchange for naming a candidate to the Senate seat and noted that

none of them would be attainable if it were not for the fact Blagojevich had the right to fill the Senate seat.

Later on November 5, 2008 (Blagojevich Call #261), Blagojevich talked to Harris. They discussed what Blagojevich should say to Labor Union Official regarding what Blagojevich wanted in exchange for naming Senate Candidate B to the Senate seat. Blagojevich practiced with Harris his statements to Labor Union Official, including suggesting to Labor Union Official that Blagojevich was interested in naming Individual L to the Senate seat. Blagojevich and Harris discussed how Blagojevich could "make a play" for a job in Washington. Harris suggested that Blagojevich tell Labor Union Official that Blagojevich wanted to accommodate the president-elect, but also wanted to take care of the people of Illinois. Blagojevich responded by stating "Yeah. And, and, and my, and me, do I say me." Harris stated "Right, by, by keeping me strong." Blagojevich responded to Harris "But I don't want that. I'm not looking for that. I'd like to get out, the fuck outta here." Shortly thereafter, Blagojevich stated that "the objective is to, to get a good gig over there." Harris stated that if Blagojevich's goal was to trade the Senate seat for a job elsewhere, then Blagojevich needed to "put it on the table" with Labor Union Official. Thereafter, Blagojevich continued to practice with Harris his statements for his meeting with Labor Union Official.

Shortly thereafter on November 5, 2008 (Blagojevich Call #262), Blagojevich again talked to Harris. Harris told Blagojevich that Harris did not think that the president-elect would provide Blagojevich with a cabinet-level job in exchange for naming Senate Candidate B to the Senate. Thereafter, Blagojevich and Harris discussed whether Blagojevich could get an ambassadorship in exchange for naming Senate Candidate B to the Senate seat. Blagojevich told Harris to do research with trading partners of the United States. Blagojevich questioned whether the president-elect could

do "something big" in the "private sector" for Blagojevich in exchange for the Senate seat. Blagojevich and Harris then discussed various private sector jobs Blagojevich might want in exchange for the Senate seat. Blagojevich directed Harris to start researching private foundations in which Blagojevich could get a job "right away." In particular, Blagojevich told Harris to "see what they pay." Blagojevich told Harris that either Harris or Deputy Governor A should do the research, but that word should not get around about the project.

Shortly thereafter on November 5, 2008 (Blagojevich Call #263), Blagojevich had a conversation with Harris and Deputy Governor A. Based on Harris's prior conversations with Blagojevich, Harris informed Blagojevich that Harris had told Deputy Governor A that they were looking for a "reasonable ask" in exchange for the Senate seat that "takes care" of Blagojevich's family and keeps Blagojevich's future political ambitions open. Harris stated they were now looking at private foundations in which the president-elect might have influence and would not appear to look like a "deal" for the Senate seat. Harris suggested they look at private foundations that were "heavily dependent on federal aid." Deputy Governor A agreed to help with the research and asked whether Blagojevich was looking for this job now or after Blagojevich left office in 2010. Blagojevich stated "now." Deputy Governor A and Harris discussed with Blagojevich various private foundations about which they were familiar. Blagojevich stated, "something like that would be great. What does that pay?" Blagojevich suggested to Harris and Deputy Governor A that it was difficult to see this kind of deal coming together, but told Deputy Governor A and Harris to find the foundations that SEIU funded. Deputy Governor A agreed that they should find the foundations SEIU funded because then SEIU could help broker the deal with Blagojevich. Again, Blagojevich told Deputy Governor A and Harris to "look into those ones that are funded by labor."

77

Later on November 5, 2008 (Blagojevich Call #281), Blagojevich spoke to Advisor B about Blagojevich's interest in getting a private foundation job. Blagojevich told Advisor B that SEIU and the president-elect could remove the head of a particular foundation and give the position to Blagojevich. Blagojevich told Advisor B that it was unlikely that he would be able to get a cabinet position in exchange for the Senate seat, but "Health and Human Service would be my . . . I'd take that in a second."

Later on November 5, 2008 (Blagojevich Call #284), Blagojevich again spoke with Deputy Governor A. Deputy Governor A reported back on research he had done for Blagojevich on private foundations. In particular, Blagojevich asked Deputy Governor A about a particular charitable organization that they had discussed previously. Deputy Governor A responded "So, it was founded by two guys one was an entrepreneur." Blagojevich responded "No, but how much money does the guy make?" Deputy Governor A told Blagojevich it was hard to find salaries on-line, but Deputy Governor A was still looking into the issue of pay. Deputy Governor A also informed Blagojevich that Blagojevich could sit on other boards to make additional money if Blagojevich took a job with a private foundation. Deputy Governor A stated that the director of one foundation was "on two corporate boards and makes around $250,000 a year on the, in addition to her salary." Blagojevich responded "Yeah, see that's what we'd want. That's it." Deputy Governor A told Blagojevich that Blagojevich should make clear during the negotiations for the Senate seat that being on other boards "would be another part of the game." Blagojevich responded "That's right." Blagojevich told Deputy Governor A to continue to research foundations. Blagojevich then practiced with Deputy Governor A what Blagojevich would say publicly about certain criteria he was using to fill the

Senate seat, including the future senator's position on health care.  In fact, Blagojevich was not using his publicly-stated criteria to fill the Senate seat.

On the morning of November 6, 2008 (Blagojevich Calls #317, 319, and 321), Blagojevich talked to Harris.  Blagojevich had arranged a meeting with Labor Union Official for later that afternoon.  Harris and Blagojevich discussed the meeting with Labor Union Official and how Blagojevich could ask for what Blagojevich wanted from Labor Union Official.  Blagojevich stated he had heard that Senate Candidate B might be interested in a cabinet-level position.  Blagojevich suggested he tell Labor Union Official that "they're willing to give [Senate Candidate B] a cabinet spot so if that's the case, then give me the cabinet spot and give her, we'll give her the Senate." Later Blagojevich asked whether they should have someone go to Senate Candidate B and tell Senate Candidate B that if Blagojevich received the Secretary of HHS position, Blagojevich "could appoint you in a second."  Later in the call, Harris suggested that Blagojevich request a position as the paid national coordinator for Change To Win, an organization partially funded by SEIU, in exchange for naming Senate Candidate B to the Senate seat.  Harris suggested to Blagojevich that the Change to Win idea might be better than a private foundation because the Change to Win job is controlled by SEIU and Blagojevich would not necessarily have to step down as governor to take it immediately, like he might have to do with a private foundation job.  Blagojevich responded that the Change to Win idea was a "fucking great idea."  Later, Blagojevich stated he would like to be on some "corporate boards" in addition to taking the Change to Win job.  Harris responded that Harris thought Change to Win would be a full-time job.  Blagojevich asked "would I be able to get a little extra income though."  Harris responded that he did not think Blagojevich would want to sell himself to SEIU as a part-time employee.  Blagojevich responded "No, but if I could sit on a couple

a boards, that's not much time, or teach a class."  Later Blagojevich asked how much the Change to Win job would pay.  Harris suggested it probably paid at least what Labor Union Official made working for SEIU.  Blagojevich responded "I betcha he makes, well he lives on the north shore, you gotta think he makes more than the governor, right?"

Later on November 6, 2008 (Blagojevich Calls #345 and 347), Blagojevich talked to his wife.  Blagojevich informed his wife that Individual N, a wealthy supporter of Blagojevich's, had asked for the vacant Senate seat.  Blagojevich stated that he "planted" with Individual N the issue of Blagojevich needing to figure what he was going to do after being governor in relation to the Senate seat.  Blagojevich informed his wife that Blagojevich was meeting with Labor Union Official that afternoon.  Blagojevich talked to his wife about becoming the national director of Change to Win and that "hopefully you get paid decent."  Blagojevich also informed his wife that Change to Win would allow him to form a national network of low wage workers to help in his future political career.  During the conversation, Blagojevich's wife looked up information about Change to Win on the internet, in part to determine "what they paid their people in 2006."  Blagojevich's wife had trouble finding the salary information on-line.  Blagojevich responded "Don't worry about it.  Yeah, that's, you negotiate that.  I'd like a 4-year contract for a million a year or somethin'. . . . Or 750 or whatever.  It'd have to be good.  Obama's got excess money, he just gives them more money."  Blagojevich told his wife he was not sure the Change to Win idea would happen, but it was one of several options.

On November 6, 2008, Blagojevich met with Labor Union Official alone.  During the meeting, Labor Union Official advocated that Senate Candidate B be named to the Senate seat.  In response, Blagojevich lied and informed Labor Union Official that Blagojevich was in "active"

discussions with Individual L and her father about making Individual L the senator. Thereafter, Blagojevich made clear to Labor Union Official that he would name Senate Candidate B to the Senate seat in exchange for being named Secretary of HHS. Labor Union Official told Blagojevich he did not think being named to Secretary of HHS was going to happen.

On November 7, 2008, Blagojevich discussed his request for the Secretary of HHS position with several individuals, including Advisor B (Blagojevich Call #375). Although Blagojevich still thought getting the Secretary of HHS was a longshot, he thought that after the meeting with Labor Union Official the prospect was "a little likelier." Blagojevich informed Advisor B, "So [Senate Candidate B's] holding Health and Human Services and I'm holding a U.S. Senate seat. Okay? She's holding hers with two hands, just kind'a clinging to, you know, little pieces of it. Me, I've got the whole thing wrapped around my arms, mine, okay? . . . I'm willing to trade the thing I got tightly held to her for something she doesn't hold quite as tightly. How bad do you want what I have and can you get the other person [Obama] who's really got the, this, you know, who's, who had that, to do it. If you're her, you're [Senate Candidate B], I could be a U.S. Senator and a seat I, I can hold."

Later on November 7, 2008 (Blagojevich Calls #403, 405, 406, and 408), Blagojevich spoke to Harris and Advisor A, a political advisor, about, among other things, Blagojevich's request for the Secretary of HHS position and the possibility of obtaining a job with Change to Win. Advisor A suggested that it would be difficult for Blagojevich to obtain a federal government job that would require Senate confirmation, but that Blagojevich might be able to get a high-ranking federal job that did not require Senate approval. Blagojevich rejected Advisor A's suggestion because the other high-ranking federal jobs did not pay enough money. Advisor A told Blagojevich that Advisor A

liked the Change to Win idea. Blagojevich asked whether the Change to Win idea was better than trying to work out a deal to provide the Senate seat to Individual L. Advisor A indicated the Change to Win idea was better to help Blagojevich financially and his future politically. Blagojevich agreed.

On November 10, 2008[23/] (Blagojevich Call #451), Blagojevich discussed the Senate seat on a conference call with a variety of individuals. During the call, Blagojevich stated "Individual I thinks we can get [Blagojevich's wife], uh, on some corporate boards, paid corporate boards. What do you think of that?" Individual I responded "Could Obama help on the private sector [Individual F], where it wouldn't be tied to him? . . . So it wouldn't necessarily look like one for the other but." The majority of the call centered around how Blagojevich could use his ability to fill the Senate seat to help Blagojevich in his post-political career. Blagojevich noted he was not in a position to state he would not run for re-election again because he still had "to raise money for lawyers. . . ." Blagojevich was repeatedly told by individuals on the phone call that he needed to make the Senate pick and good things would happen later, but that he should not expect to receive a particular thing right now. In response to one of these statements, Blagojevich's wife stated "I don't think you live your life hoping that somebody is gonna help you down the line." Blagojevich stated "Yeah," and Blagojevich's wife then stated "That's a bunch of baloney."

Ultimately, Blagojevich stopped pursuing the Change to Win idea for several reasons. First, Blagojevich learned that Labor Union Official's salary was not what Blagojevich had hoped and therefore a salary at Change to Win would not be at a level that Blagojevich wanted. Second, Blagojevich became uncertain that a Change to Win job would still be present in 2010 when Blagojevich left the governorship because the job was dependent on others being willing to give

---

[23/] November 8, 2008, was a Saturday, and November 9, 2008, was a Sunday.

him the position several years later. As a result of these concerns, Blagojevich began to conspire to trade the Senate seat to Senate Candidate B in exchange for millions of dollars in funding for a 501(c)(4) organization that Blagojevich would start from scratch, could control, and would provide certainty for a well-paying job after Blagojevich was no longer governor.

On November 11, 2008 (Blagojevich Calls #487, 489), Blagojevich mentioned the idea of a 501(c)(4) to Harris and that it was a place for Blagojevich "to ultimately be" but it would advocate for health care while Blagojevich was still governor. Later on November 11, 2008 (Blagojevich Call #493), Blagojevich told Advisor B that the 501(c)(4) would have "a Board that, you know, I'm comfortable with and then when I'm no longer governor I go over there." Blagojevich also suggested to Advisor B that they should see if Individual N would fund the 501(c)(4) in exchange for the Senate seat.

On November 12, 2008 (Blagojevich Call #521), Blagojevich informed Harris that CNN was reporting that Senate Candidate B was going to take a position in the White House. Blagojevich and Harris discussed the prospect that this was just a rumor meant to make it harder for Blagojevich to negotiate something of value in exchange for naming Senate Candidate B to the Senate seat. Blagojevich returned to the prospect of asking for millions of dollars in funding for a 501(c)(4) in exchange for naming Senate Candidate B to the Senate seat. Blagojevich told Harris that Blagojevich would name the Board of Directors of the organization so it would be controllable while Blagojevich was still governor, but that the organization would be without a "major player until I were to go there." Later, in reference to associates of Senate Candidate A offering Blagojevich significant amounts of campaign money in exchange for naming Senate Candidate A to the Senate seat, Blagojevich stated "what [Senate Candidate A] got third parties saying to me is a heck of a lot

more substantial than what we're getting from the Obama people, okay?" Blagojevich stated that his concern with Senate Candidate A is that Blagojevich does not trust Senate Candidate A to come through with the promise of campaign money. Shortly thereafter, Blagojevich again instructed Harris to have the "off campus discussion" with Individual M regarding getting campaign funds in exchange for naming Individual M to the Senate seat.

Later on November 12, 2008 (Blagojevich Calls #533, 535, and 537), Blagojevich spoke to Advisor A. Blagojevich explained his 501(c)(4) idea to Advisor A and stated it would be a place for Blagojevich to get a job after he was governor, like Change to Win. Advisor A told Blagojevich that Advisor A liked Change to Win better because it had "fewer fingerprints." Blagojevich stated his concern with Change to Win was that it might not be there in two years while the 501(c)(4) was something Blagojevich could "control."

Shortly thereafter on November 12, 2008 (Blagojevich Call #539), Blagojevich talked to Harris. Harris told Blagojevich that Harris had talked to United States Congressman A and that Senate Candidate B was, in fact, going to take a position at the White House.

Immediately after learning that Senate Candidate B may have taken herself out of consideration for the Senate seat, Blagojevich made a direct effort to obtain money for his 501(c)(4) in exchange for naming Senate Candidate B to the Senate seat. Blagojevich called Labor Union Official (Blagojevich Call #541). During the call, Blagojevich informed Labor Union Official that "one thing" Blagojevich would be interested in was the creation of a "501(c)(4)" issue advocacy organization. Blagojevich stated the organization would be there if he were not governor anymore. Blagojevich stated that right now it would be run by people he trusts and it would be a health care organization. Blagojevich told Labor Union Official that certain wealthy individuals could put $10,

$15, or $20 million into the organization over night. Blagojevich then stated that he and the organization could "help our new Senator, [Senate Candidate B], go out" and push an agenda. Labor Union Official understood that Blagojevich was connecting the funding of the 501(c)(4) organization to Blagojevich naming Senate Candidate B to the Senate. Although Labor Union Official told Blagojevich that Labor Union Official would get back to Blagojevich regarding Blagojevich's request for money, Labor Union Official never did.

Thereafter, in a series of a calls on November 12, 2008, Blagojevich indicated that his choice to fill the Senate seat was based on three criteria. In order, Blagojevich indicated his first criterion was his "legal" situation, which he further indicated was the picking of a candidate whose appointment might help Blagojevich with his current legal situation in relation to the ongoing federal criminal investigation into Blagojevich's actions. At times, Blagojevich indicated that naming himself the senator would help fit his "legal" criterion because Blagojevich believed he was less likely to be indicted if he was in Washington D.C. and because, as a Senator, he would have a "voice" in who the U.S. Attorney was for the Northern District of Illinois, although he would have to "officially" recuse himself from the decision. Blagojevich's second criterion was his "personal" situation, which Blagojevich repeatedly indicated was premised on his and his family's financial well being. Blagojevich's third criterion was his "political" situation.

Later on November 12, 2008 (Blagojevich Call #594), Blagojevich talked to Robert Blagojevich about filling the Senate seat. Regarding filling the Senate seat, Robert Blagojevich stated his advice was that Blagojevich "make sure it's tit for tat, man you get something. I wouldn't give anything away."

After Blagojevich learned that Senate Candidate B was going to the White House, Blagojevich still believed that there were several candidates favored by Obama to fill the Senate vacancy and that Blagojevich might still be able to personally profit from a deal for the Senate seat.

On November 13, 2008, Blagojevich participated in several calls with Advisor B in which he continued to push his idea of obtaining funding for a 501(c)(4) in exchange for naming a candidate favored by Obama to the Senate vacancy. In one call on November 13, 2008 (Blagojevich Call #624), Blagojevich stated that if Senate Candidate B could still get the Senate seat, Blagojevich thought she would take it. Blagojevich informed Advisor B that Blagojevich had mentioned his 501(c)(4) idea to Labor Union Official. Blagojevich suggested he still might have leverage to get what he wanted for the Senate seat because Obama would not want Blagojevich to take the Senate seat himself.

Later on November 13, 2008 (Blagojevich Call #627), Blagojevich again spoke with Advisor B. Blagojevich asked Advisor B to reach out to Lobbyist A, who Blagojevich knew to have a friendship with United States Congressman A, to have Lobbyist A pass a message to United States Congressman A that Blagojevich wanted help with the funding of a 501(c)(4). During the call, Blagojevich stated, "the mission for Lobbyist A is to, essentially put it in [United States Congressman A's] head that we would like them to help us, you know, fund it." In response, Advisor B stated that while it was not said, this was "a play to put in play others." Blagojevich responded that what Advisor B was saying was "correct." It was clear to Advisor B that Blagojevich was saying that Blagojevich wanted to communicate to United States Congressman A that the funding of the 501(c)(4) would get Obama the person he wanted in the Senate. Advisor B asked Blagojevich whether Obama was still interested in Senate Candidate B, or whether there was another

play here. Blagojevich said there was possibly still interest in Senate Candidate B, but suggested Obama also had an interest in others for the Senate seat. Advisor B understood that Blagojevich was willing to trade the Senate seat to whomever Obama wanted if Obama would fund his 501(c)(4).

After it became clear that Senate Candidate B was going to take a position in the White House and that Blagojevich was not getting a response to his requests for personal financial benefits in exchange for the Senate seat, Blagojevich spent several weeks discussing a variety of potential candidates for the Senate seat without taking any particular action in regards to filling the Senate vacancy. From time to time during this period, Blagojevich considered personal benefits that he could obtain from naming certain candidates, and certain times he considered political benefits to the State of Illinois from naming certain candidates.

After several weeks of general discussions about a variety of candidates, Blagojevich again made efforts to personally profit from filling the Senate vacancy. On December 4, 2008 (Blagojevich Call #1334), Blagojevich informed Harris that Blagojevich had dismissed Senate Candidate A too early and was now going to "objectively honestly" consider Senate Candidate A. Blagojevich informed Harris that Senate Candidate A had come to Blagojevich "through third parties, you know, with offers of campaign contributions and help . . . . You know what I mean? 1.5 million they've, they're throwin' numbers around."[24/] Harris told Blagojevich that campaign

---

[24/] On October 28, 2008, Robert Blagojevich met with Individual O, an associate of Individual P. After that meeting, Robert Blagojevich told Blagojevich that Individual O had indicated that Individual P, an associate of Senate Candidate A's and a significant fundraiser for Blagojevich, would do some "accelerated fundraising" on Blagojevich's behalf before the end of the year if Senate Candidate A were selected to fill the Senate seat. On October, 31, 2008, Individual P spoke with Robert Blagojevich. Shortly after that conversation, Blagojevich explained to Deputy Governor A that Blagojevich had been offered by an "emissary" of Senate Candidate A a total of $1.5 million in campaign contributions if Blagojevich appointed Senate Candidate A to

(continued...)

contributions should not be a factor in Blagojevich's decision on the Senate seat. Later in the conversation Blagojevich stated that another individual was not going to be considered to fill the Senate seat because she had "bounced" a fundraising check to Blagojevich.

Shortly thereafter on December 4, 2008, Blagojevich had a series of conversations with Deputy Governor A and Advisor A. In one call (Blagojevich Call #1351), in relation to naming Senate Candidate A to fill the Senate seat, Blagojevich told Advisor A, "there are tangible things that can happen before" Blagojevich named Senate Candidate A to the Senate seat. Advisor A asked if the deal was essentially one in which Senate Candidate A would support Blagojevich for reelection. Blagojevich responded, "no, there's more to it." When Advisor A asked, "what else," Blagojevich stated, "There's tangible, concrete tangible stuff from supporters." Advisor A continued to try to understand Blagojevich, who ultimately stated that he was talking about "Specific amounts and everything. And while, you know, I don't know that all of that is achievable, there is, some of it up-front." Blagojevich stated that he was still leaning towards choosing Individual L for the Senate seat because it would help get things done for the people of Illinois, but complained "there's nothing left there for me" regarding filling the Senate seat. Blagojevich noted "[Senate Candidate A] wants it badly and desperately and he's the only one who's willing to, like, offer stuff."

Shortly thereafter, Blagojevich spoke to Deputy Governor A (Blagojevich Call #1354). Blagojevich told Deputy Governor A that he was trying to elevate Senate Candidate A with the Washington D.C. establishment to help with getting Individual L named senator, although Deputy

---

24/(...continued)
fill the Senate seat.

Governor A believed that Blagojevich was lying to him. Blagojevich told Deputy Governor A he was not "gonna completely" rule out naming Senate Candidate A

Approximately seven minutes later, Blagojevich spoke to Robert Blagojevich (Blagojevich Call #1357). Blagojevich told Robert Blagojevich that Blagojevich was elevating Senate Candidate A Robert Blagojevich stated that if Blagojevich did appoint Senate Candidate A then Robert Blagojevich wanted to focus fundraising on the "money centers . . . in the black community." Blagojevich told Robert Blagojevich to "talk to [Individual P]," who Blagojevich understood was an individual willing to provide campaign contributions in exchange for naming Senate Candidate A the senator. Blagojevich told Robert Blagojevich to tell Individual P that naming Senate Candidate A to the Senate seat was "realistic." Blagojevich wanted Robert Blagojevich to tell Individual P that promises of campaign contributions in exchange for the Senate seat are "all well and good" but that Senate Candidate A has lied to Blagojevich in the past. Blagojevich told Robert Blagojevich to tell Individual P that while Senate Candidate A being named to the Senate seat was "possible . . . some of the stuff's gotta start happening now." Robert Blagojevich responded, "Yep." Blagojevich stated, "Right now." Robert Blagojevich responded, "Very good." Blagojevich stated, "And we gotta see it." Robert Blagojevich stated, "Okay." Blagojevich stated, "You understand? Now you gotta be careful how you express that. And assume everybody's listening, the whole world's listening." Robert Blagojevich responded, "Right." Blagojevich stated, "You hear me?" Robert Blagojevich responded, "Right, right, right." Blagojevich stated, "But if there's tangible political support like you've said, start showing us now." Robert Blagojevich stated he would make the call to Individual P that afternoon. Blagojevich stated, "I would do it in person. I would not do

it on the phone." Blagojevich stated Robert Blagojevich should make clear to Individual P there is an "urgency to it." Robert Blagojevich responded, "Yeah. Ah, yes, I can do that. That's good."

Approximately fifteen minutes after Robert Blagojevich talked to Blagojevich, Robert Blagojevich called Individual P to "follow up" on conversations Robert Blagojevich had with Individual P the previous month. Robert Blagojevich asked Individual P if Individual P was available that afternoon to talk. Ultimately, Robert Blagojevich and Individual P agreed to meet the following morning to talk.

Late on the evening of December 4, 2008, Blagojevich learned that the Chicago Tribune was going to print an article suggesting that Blagojevich had been recorded in relation to an ongoing federal criminal investigation.

Early on the morning of December 5, 2008, Blagojevich spoke to Robert Blagojevich. Blagojevich told Robert Blagojevich to cancel the meeting with Individual P. Thereafter, Robert Blagojevich called Individual P and cancelled his meeting with Individual P. Several hours later, in another call, Blagojevich again told Robert Blagojevich to "undo" Robert Blagojevich's meeting with Individual P. Robert Blagojevich told Blagojevich that cancelling the Individual P meeting was already "done."

Thereafter, Blagojevich continued to participate in a variety of conversations about the Senate seat until his arrest on December 9, 2008.

## IV.    CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that a conspiracy existed involving defendant Rod Blagojevich, Blagojevich's wife, defendant Robert Blagojevich, Christopher Kelly, Antoin Rezko, Alonzo Monk, Stuart Levine, Sheldon Pekin, Joseph

Cari, Jacob Kiferbaum, William Cellini, John Harris, Deputy Governor A, Individual I, Advisor A, and Advisor B, and that conspiracy allowed defendants Rod Blagojevich and Robert Blagojevich to commit the charged offenses. This Court should find, based upon this proffer, that co-conspirators' statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:     s/Christopher S. Niewoehner
        CHRISTOPHER S. NIEWOEHNER
        REID J. SCHAR
        CARRIE E. HAMILTON
        Assistant U.S. Attorneys
        219 South Dearborn Street, Room 500
        Chicago, Illinois 60604
        (312) 353-5300